DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Damien Stafford ("Stafford"), appeals from the decision of the Summit County Court of Common Pleas. This Court affirms.
 I. {¶ 2} On August 18, 2007, Terrance Owens ("Owens"), the victim herein, and a few friends went to a club. After the club closed, Owens drove to a gas station on the corner of V. Odom Blvd. and Hawkins for his friends to purchase cigarettes. According to testimony at trial, the gas station was a popular hangout after the bars and clubs had closed. Unable to find a parking spot, Owens pulled behind the gas station and parked his car. He testified that as he was walking toward the front of the station, he observed Stafford standing in front of a vehicle with a gun. Stafford said something to Owens and then got into the car where another individual, Ronald Lewis, was sitting. Lewis then got out of the car with the gun and proceeded to rob *Page 2 
Owens of his jewelry and some money. As Owens walked away he heard two gunshots. Owens then called the police.
 {¶ 3} Owens went to the police station and was shown a photo array. He identified an individual named Michael Herring as the man who robbed him. The next day, Owens called the police to inform them that he had made a mistake and that Herring was not the man who robbed him. Owens brought the police a computer photo of Stafford and a photo of Lewis from the website Myspace. He indicated that these were the men who robbed him. Several days later, a friend of Owens saw Lewis standing on the corner of Talbot and Lovers Lane, wearing Owens' jewelry. Owens called the police and the police interviewed Lewis. Owens then took police photographs of himself wearing the same jewelry. Lewis was later arrested and charged with the robbery.
 {¶ 4} Stafford was indicted on September 6, 2007. He was charged with one count of aggravated robbery, in violation of R.C. 2911.01(A)(1), with a firearm specification, in violation of R.C. 2941.145, and one count of robbery, in violation of R.C. 2911.02(A)(1)/(2), with a firearm specification, in violation of R.C. 2941.145. On October 2, 2007, a supplemental indictment was filed, charging Stafford with one count of criminal gang activity, in violation of R.C. 2923.42(A), and one count of having weapons while under disability, in violation of R.C. 2923.13(A)(2)/(A)(3). On October 26, 2007, another supplemental indictment was filed, charging Stafford with one count of criminal gang activity, in violation of R.C. 2923.42(A). Stafford pled not guilty to the charges in the indictment.
 {¶ 5} Prior to trial, the trial court dismissed the robbery count and the October 2, 2007 count of criminal gang activity. The case proceeded to a jury trial, and on January 18, 2008, the jury found Stafford guilty of aggravated robbery with a firearm specification, having weapons *Page 3 
while under disability, and criminal gang activity. On February 22, 2008, the trial court sentenced Stafford to eight years of incarceration. Stafford timely appealed the verdict and sentence, raising three assignments of error for our review. We have combined some of Stafford's assigned errors for ease of review.
 II. ASSIGNMENT OF ERROR I "[STAFFORD'S] CONVICTIONS OF AGGRAVATED ROBBERY, HAVING WEAPONS WHILE UNDER DISABILITY, AND CRIMINAL GANG ACTIVITY, WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED IN FAILING TO GRANT [STAFFORD'S] CRIMINAL RULE 29 MOTION TO DISMISS THE COUNTS OF AGGRAVATED ROBBERY, HAVING WEAPONS WHILE UNDER DISABILITY, AND CRIMINAL GANG ACTIVITY, FOLLOWING THE STATE'S CASE AND AT THE CONCLUSION OF THE EVIDENCE."
 {¶ 6} In his first two assignments of error, Stafford contends that his convictions were based on insufficient evidence and were against the manifest weight of the evidence. We do not agree.
 {¶ 7} Crim. R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal *** if the evidence is insufficient to sustain a conviction of such offense or offenses." A trial court may not grant an acquittal by authority of Crim. R. 29(A) if the record demonstrates "that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt." State v. Wolfe (1988), 51 Ohio App.3d 215, 216. In making this determination, all evidence must be construed in a light most favorable to the prosecution. Id. *Page 4 
 {¶ 8} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). Further
 "[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2.
Therefore, we will address Stafford's claim that his convictions were against the manifest weight of the evidence first, as it is dispositive of his claim of insufficiency.
 {¶ 9} A determination of whether a conviction is against the manifest weight of the evidence does not permit this Court to view the evidence in the light most favorable to the State to determine whether the State has met its burden of persuasion. State v. Love, 9th Dist. No. 21654,2004-Ohio-1422, at ¶ 11. Rather,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 10} In the instant case, Stafford was convicted of aggravated robbery with a firearm specification, having weapons while under disability and criminal gang activity.
 {¶ 11} Pursuant to R.C. 2911.01(A)(1),
 "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or *Page 5 
offense, shall *** [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"
 {¶ 12} Further, the jury found that Stafford "had a firearm on or about [his] person or under [his] control while committing the offense and displayed the firearm, brandished the firearm, indicated that [he] possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A).
 {¶ 13} During its instructions to the jury, the trial court informed the jury that "[y]ou may find [Stafford] guilty of the offense of aggravated robbery if you find that [he] was complicit in the commission of the offense of aggravated robbery." The Ohio Supreme Court has held that "a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is stated in terms of the principal offense and does not mention complicity." (Quotations and alterations omitted.) State v.Herring (2002), 94 Ohio St.3d 246, 251. R.C. 2923.03(F) provides that "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense."
 {¶ 14} R.C. 2923.03(A)(2) states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall *** [a]id or abet another in committing the offense[.]" A person aids or abets another when he supports, assists, encourages, cooperates with, advises, or incites the other person in the commission of the crime, and shares the other person's criminal intent. State v. Johnson (2001),93 Ohio St.3d 240, syllabus. His "intent may be inferred from the circumstances surrounding the crime." Id. His mere presence at the scene of a crime, however, is not in and of itself sufficient. Id. at 243.
 {¶ 15} Stafford was also convicted of having a weapon while under disability. Pursuant to 2923.13(A)(2)/(A)(3) *Page 6 
 "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
 "(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.
 "(3) The person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been an offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse."
 {¶ 16} Finally, Stafford was convicted of one count of criminal gang activity, in violation of R.C. 2923.42(A). Pursuant to this section:
 "[n]o person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code." R.C. 2923.42(A).
 {¶ 17} The jury heard testimony from Owens. Owens testified that on August 18, 2007, he was at a car wash on Hawkins and V. Odom Blvd. He stated the he had previously gone to a club with some friends, but they left around 1:45 a.m. At the gas station, Owens testified that he let his two friends out of the car, and then went around the back to park. When he got out of the car and walked across the grass, he observed Stafford, sitting outside a car with a gun in his hand. Owens stated that Stafford briefly spoke to him, and then got back in the car. At this point, according to Owens, another man got out of the car with the gun in his hand. The man put the gun to Owens' chest and told him to take off his jewelry. The man then forced Owens to his truck to get some money. The man ran off and Owens heard two gun shots. Owens testified that the car in question was a black, newer model, Grand Prix. He stated that he recognized Stafford because they grew up in the same neighborhood. He testified that he did not know Stafford's *Page 7 
"government name" but knew him as K.D. Owens stated that after the man left, he called the police. Owens testified that he gave the police the name K.D.
 {¶ 18} According to Owens, he had never seen Lewis before and did not correctly identify him from a police photo array immediately following the incident. Instead he identified Michael Herring as his assailant. Owens stated that he realized later that he had misidentified Herring and that he had seen a photo of Lewis on Myspace. He further stated that a friend had told him Lewis' real name. He took the photo to the police. Days later, according to Owens, a friend saw Lewis on the corner of Talbot and Lovers Lane wearing his jewelry. Owens called the police who went to the area and identified Lewis. Owens took the police photos of him in his jewelry so that he could prove that the jewelry was his. Lewis was arrested the next day wearing Owens' jewelry.
 {¶ 19} Owens testified that after the robbery, someone gave him Stafford's phone number. He stated that he called Stafford in an effort to retrieve the stolen items, but to no avail. He testified that the gun used to rob him was a black 9 mm gun. He said that he got a good look at it because it was "in [his] face." He further stated that the gun Lewis used to rob him was "most definitely" the same gun he saw Stafford holding. Owens then identified Stafford in court.
 {¶ 20} On cross-examination, Owens testified that he was "pretty sure" that there were gangs in his neighborhood. He further stated that he knew Stafford from his neighborhood but never "hung out with him[.]" Owens testified that he had only two drinks at the club and agreed with counsel that people liked to park cars, play music, walk around, and do drugs at the gas station. Owens stated that he liked to avoid the gas stations and that he was just dropping his friends off who were supposed to come right back. When they did not, he parked his car around the back. He stated that he was not going to the gas station to "party," but to let his friends get *Page 8 
cigarettes. He stated that he parked his car so that he could go find his friends to take them home. Owens admitted that he did not actually see Stafford hand Lewis the gun, but that he saw Stafford get in the car and Lewis get out of the car with the same gun. He testified he was watching them carefully because he saw that they had a gun. When asked if this incident had anything to do with a gang, Owens said no. He testified that Stafford did not help him nor try to stop Lewis from robbing him. Owens further admitted that at the time of the incident, he told the police that the car involved was a blue Pontiac Grand Prix. He stated that he changed his mind to black later because he later discovered that Stafford was driving a black vehicle that night.
 {¶ 21} Owens verified that he had previous felonies, including possession of cocaine in 1999, possession of cocaine and falsification in 2001, failure to comply in 2004, and in 2005, a conviction of forgery.
 {¶ 22} The jury next heard from Akron Police Lieutenant James Phister ("Phister"). Phister testified that he had Owens come to the station to look at a photo array of possible suspects. He stated that Owens identified Herring immediately. Owens informed Phister that he did not know the name of the passenger but he would get it to him in a few days. Owens further informed Phister that he knew the passenger from his neighborhood. According to Phister, Owens called the following day, stating that he had made a mistake and that Herring was not the suspect that had held a gun to him. Phister testified that several days later, Owens flagged down a police officer and informed him that the suspect was on the street corner wearing his jewelry.
 {¶ 23} On cross-examination, Phister stated that at no time during his interview of Owens did Owens give him the name K.D. Phister stated that Owens told him that he could not remember the name. He indicated that he saw Stafford pass Lewis the gun. Owens further informed Phister that the men were both sitting inside the car. Phister stated that on the night of *Page 9 
the incident, Owens was 100% sure that Herring was his assailant. Phister further verified that on the night of the incident, Owens informed him that the suspect's vehicle was dark blue and that he was not sure of the make of the vehicle. He further explained that dark blue and black are often mistaken.
 {¶ 24} The jury heard testimony from Akron Police Officer James Donohue ("Donohue"). Donohue testified that he was familiar with Stafford and that he had previously pulled over a vehicle in which Stafford was riding. He stated that upon search of the vehicle, he located a bullet-proof vest. He indicated that there was no legitimate reason for anyone in the car to have the vest. On cross-examination, Donohue confirmed that the vehicle was not Stafford's and Stafford was not driving. On redirect-examination, Donohue stated that in his experience, people involved in crime often have bullet-proof vests.
 {¶ 25} Akron Police Detective Larry Rhodaback ("Rhodaback") testified that he was involved in the investigation of Stafford and Lewis. He explained that he was flagged down on Arlington St. by someone who said he had been robbed and saw the suspect on the corner of Talbot and Lovers Lane. Upon investigation, Rhodaback saw Lewis wearing the allegedly stolen items.
 {¶ 26} Rhodaback further testified that in 1999, he was involved in an investigation involving Stafford. He testified that he chased Stafford and Stafford confessed that he had a bullet-proof vest. Accordingly, officers initiated an investigation searching for weapons and charged Stafford with carrying a concealed weapon, having a weapon while under disability, aggravated menacing, and assault. Rhodaback testified that it is not common for normal citizens to have bullet-proof vests. *Page 10 
 {¶ 27} On cross-examination, Rhodaback testified that there were no gang charges as a result of the 1999 incident. However, he stated that Stafford was "known to the Akron police at that time as a potential gang member." On redirect-examination, Rhodaback testified that there was another person present during the 1999 incident.
 {¶ 28} The State next presented the testimony of Akron Police Officer Donald Schismenos ("Schismenos"). The parties stipulated that Schismenos was an expert in gang investigations. Schismenos testified that he was very familiar with the gang Kaika Klan Outlaws ("KKO"). He testified that the KKOs are known to be active in the area of Akron in which this incident occurred. He stated that it was part of his job as a member of the street crimes gang unit to keep current on gangs and gang culture. Schismenos testified that there are roughly 45 active gangs in Akron. He stated that "[w]ithin Ohio a gang is a group of three or more persons that go about together with a common name and one or more common identifying signs, symbols or colors and their main purpose is to commit criminal activity." He further stated that gang members gain power within the gang by committing violent acts.
 {¶ 29} Schismenos testified that he looks for graffiti, which way an individual wears a hat, tattoos, self-admission, branding, and colors, to identify gang members and gang activity. Schismenos stated that the KKO colors are red and black. He further stated that gang members tend to use street names. Schismenos then gave the jury an extensive history of the KKO. Schismenos testified that Stafford was an original member of the gang that eventually became KKO. He stated that the KKO was one of the largest gangs in Akron.
 {¶ 30} Schismenos testified that he had contact with members of the KKO thousands of times, and that he knew Stafford as K.D. or King Damian. He then identified Stafford in court. Schismenos testified that during a search of a known KKO drug house, he had located a photo of *Page 11 
Stafford that had KKO insignia on the back. Schismenos further testified that Stafford had a tattoo of K.D. with 380 splitting the letters. According to Schismenos, 380 has been identified as KKO insignia.
 {¶ 31} Schismenos testified that he has known the KKOs to sell drugs and that the KKOs are a "gain-oriented gang, which means they are about money." According to Schismenos, the main way of making that money was trafficking in cocaine, which has now expanded to ecstasy pills and methamphetamines. "And a lot of times now in home invasion robbery, robberies, other ways to make money easily without working for it." He further testified that he knew KKO members to carry weapons.
 {¶ 32} Schismenos testified that he was involved in another search of a home involving the KKOs where a video was found. The video showed a gang party. Stafford was on the video "talking about different crimes that are indicative of what the Kaika Klan do." According to Schismenos, Stafford is "what's considered an enforcer in the Kaika Klan Outlaws. *** He is known for violent activity and well-respected within the Kaika Klan." Schismenos further testified that he knew Lewis to be associated with the KKOs and that there was a connection between Lewis and Stafford. Schismenos testified that upon arrest for the current incident, Stafford was wearing a red hat, one of the colors of the KKO. When asked what evidence he had in this case indicative of gang activity, Schismenos replied "[h]is colors, his association with Ronald Lewis, who is an associate gang member, the actual crime itself is indicative of that gang activity."
 {¶ 33} Schismenos testified to several investigations involving past gang violence and Stafford. He further stated that Stafford has been convicted of the gang charge before. He stated that it is common for the KKO members to commit armed robberies, usually with at least a few *Page 12 
members present. Schismenos testified to several of Stafford's past convictions: improperly discharging a firearm into a habitation on August 27, 1996, felonious assault and criminal gang activity on December 5, 2001, aggravated assault on December 10, 2001, tampering with evidence and possession of cocaine on December 12, 2003, possession of cocaine on June 18, 2007, and failure to comply with order or signal of a police officer and driving under suspension on August 13, 2007.
 {¶ 34} Schismenos testified that victims of violent crimes often may not remember everything clearly at first, and "after thinking about it, after the memory starts to come back, they can more clearly think about or remember different facts within a case."
 {¶ 35} On cross-examination, Schismenos testified that "[m]y opinion is he was there to do the robbery and when he thought he was being recognized or he recognized the person from his neighborhood, he had Ronald Lewis do the robbery." On redirect-examination, Schismenos testified that there was no evidence that Stafford had left the KKO. Schismenos stated that there was a "continual pattern of criminal conduct. His association with other gang members. Oftentimes gang members will cover over their tattoos [when they leave a gang]. He still maintains his tattoo showing 380 and KD. Actually, members of the [KKO] have covered over their tattoos that got out."
 {¶ 36} The State next presented testimony from Summit County Sheriffs Office Deputy Robert Alderman ("Alderman"). Alderman testified that he was an intake deputy and the Summit Gang Intelligence Unit lead interviewing at the Summit County Jail. He testified that he had prior contact with Stafford and that Stafford had been in jail "on more than one occasion." Alderman testified that upon intake a gang hold was put on Stafford. This meant that Stafford was suspected of being in a gang and was held for more questioning about gang activities. In *Page 13 
August of 2007, Alderman took photos of Stafford's tattoos. Alderman testified that in his opinion, the tattoos indicated that Stafford was a member of the KKO. Alderman stated that it did not appear that Stafford had left gang life due to the fact that he still appeared to be a leader in jail.
 {¶ 37} The State presented the testimony of Summit County Sheriffs Office Deputy Todd Hart ("Hart"). Hart testified that he was a booking officer and that he fills out the "gang screen" upon intake to jail. He testified to Stafford's gang screen on July 11, 2007. At that time, Stafford indicated that he was not a member of a gang but had knowledge of gang activity. When asked with which gang he was affiliated, he stated the KKOs.
 {¶ 38} The State presented the testimony of Akron Police Officer Michael Shaeffer ("Shaeffer"). Shaeffer testified that he was in the "Crimes Against Persons" unit. Shaeffer testified that in the 1990's it came to the police department's attention that Stafford was involved with the KKOs. He stated that on September 21, 2003, he observed Stafford and another gentleman with cocaine. A search of the home revealed 63 grams of powder cocaine. Stafford was charged with one count of aggravated possession of crack cocaine, manufacturing of illegal drugs, and tampering with evidence.
 {¶ 39} Stafford presented the testimony of Kadocaus Watson ("Watson") in his defense. Watson testified that he had known Owens since he was 11 years old. He stated that he was with Owens on August 18, 2007 and that they went to the gas station upon leaving a club. He further explained that everyone went to the gas station after the bars closed. Watson testified that he spoke with Owens the day following the robbery. He stated that Owens did not know the suspects' names at the time. He further testified that Owens informed him that Lewis robbed him with two guns, and that Stafford was not involved. Watson testified that he was present for *Page 14 
a phone conversation between Owens and Stafford before Stafford was arrested. Finally, Watson testified that in 2004 he had been convicted of possession of cocaine. On cross-examination, Watson admitted that he was intoxicated when they left the club in August of 2007.
 {¶ 40} It is clear from the testimony that the jury did not clearly lose its way when it found Stafford guilty of aggravated robbery with a firearm specification, having weapons while under disability and criminal gang activity.
 {¶ 41} Although Stafford's appellate brief neglects to inform this Court which elements of which crime he believes the State did not prove, we find that the State properly proved all the elements of the convicted crimes. With regard to the aggravated robbery claim, Owens testified that Stafford initially called out to him while he was crossing the parking lot and was holding a gun. Owens testified that Stafford passed the gun to Lewis who then proceeded to rob him at gun point. Owens further testified that Stafford did not help or try to stop Lewis from robbing him. Owens stated that he recognized Stafford from his neighborhood and identified him in court. It is clear from the evidence that the jury could have found that Stafford supported, assisted, encouraged, cooperated with, advised, or incited Lewis in the commission of the crime. Further, it is clear from Owens' testimony that Stafford "indicated that [he] possessed the firearm[.]" R.C. 2941.145.
 {¶ 42} With regard to having a weapon while under disability, the parties stipulated to several of Stafford's prior criminal felony convictions. Further, the jury heard testimony with regard to several possession of drug convictions, among others. As we stated above, the evidence clearly showed that Stafford was holding a firearm.
 {¶ 43} Finally, with regard to the criminal gang activity conviction, Officer Schismenos testified to the lengthy history of the KKOs. He further explained, and several other officers *Page 15 
confirmed, that Stafford was known to be a member of the KKOs. Officer Schismenos testified to Stafford's lengthy pattern of criminal history and his involvement with the KKOs. Testimony also revealed a connection between Stafford and Lewis and that Lewis also was connected with the KKOs. From the evidence presented at trial, it is clear that Stafford had knowledge of the gang activities and was acting to purposely "promote, further, or assist any criminal conduct," i.e. the aggravated robbery. R.C. 2923.42(A).
 {¶ 44} Accordingly, Stafford's first and second assignments of error are overruled.
 ASSIGNMENT OF ERROR III "THE TRIAL COURT ERRED IN FAILING TO GRANT [STAFFORD'S] BATSON CHALLENGE."
 {¶ 45} In his third assignment of error, Stafford contends that the trial court erred in failing to grant his Batson challenge. We disagree.
 {¶ 46} The Equal Protection Clause of the United States Constitution prohibits deliberate discrimination based on race by a prosecutor in his exercise of peremptory challenges. Batson v. Kentucky (1986),476 U.S. 79, 89. A defendant has a "right to be tried by a jury whose members are selected by nondiscriminatory criteria". Powers v. Ohio (1991),499 U.S. 400, 404. This Court reviews whether a party exercised its peremptory challenges in a discriminatory manner under the clearly erroneous standard. Hernandez v. New York (1991), 500 U.S. 352, 364-65; see, also,State v. Vinson, 9th Dist. No. 23739, 2007-Ohio-6045, at ¶ 21, Akron v.Burns, 9th Dist. No. 21338, 2003-Ohio-3785, at ¶ 15.
 {¶ 47} A three-part test is employed to determine whether a peremptory challenge is based on race. State v. Jones, 9th Dist. No. 22231,2005-Ohio-1275, at ¶ 27. First, the defendant must establish a prima facie case of discriminatory use of peremptory challenges by the prosecution. Batson, 476 U.S. at 96-97. To meet the first prong of the test, the defendant must *Page 16 
show that all the facts and circumstances surrounding the prosecution's exercise of peremptory challenges, used to exclude members of a cognizable group, raised an inference that the prosecution exercised challenges based on the excluded jurors' race. State v. Hill (1995),73 Ohio St.3d 433, 444-45. After the defendant makes his prima facie case, the burden shifts to the prosecution to provide a race-neutral explanation for the preemptory challenge. Id. at 445.
 {¶ 48} To meet its burden, "the prosecution must give a clear and reasonably specific explanation of [its] legitimate reasons for exercising the challenge[.]" (Internal citations and quotations omitted.) Batson, 476 U.S. at 98, fn. 20. The prosecution must provide an explanation "based on something other than the race of the juror."Hernandez, 500 U.S. at 360. "Unless a discriminatory intent is inherent in the prosecution's explanation, the reason offered will be deemed race-neutral." (Quotations and citation omitted). Purkett v. Elem
(1995), 514 U.S. 765, 768.
 {¶ 49} After the prosecution has presented its explanation, the trial court must determine whether, under all the relevant circumstances, the defendant has met his burden of proving purposeful racial discrimination. Batson, 476 U.S. at 96-97. The trial court must consider the persuasiveness and credibility of the justification offered by the prosecution. Hicks v. Westinghouse Materials Co. (1997),78 Ohio St.3d 95, 99, citing Purkett, 514 U.S. at 768. It must determine whether the neutral explanation offered by the prosecution is credible or is instead a pretext for unconstitutional discrimination. Hernandez,500 U.S. at 363. The trial court's finding turns largely on evaluations of credibility and is given great deference. Batson, 476 U.S. at 98, fn. 21. As previously stated, this Court will only reverse a trial court's finding of a racially-neutral reason if it is clearly erroneous.Hernandez, 500 U.S. 364-65. *Page 17 
 {¶ 50} In the instant matter, the record demonstrates that during voir dire, the prosecutor stated that the State's burden in this case was proof beyond a reasonable doubt and not proof beyond all doubt. She questioned Juror No. 3 as to whether he agreed with her statement. After a conversation, Juror No. 3 stated that "it would have to be proof, you know, where there's no doubt about it." Juror No. 3 further stated that he would not necessarily believe a witness because "[witnesses lie."
 {¶ 51} At the conclusion of the questioning, the State exercised a preemptory challenge, removing Juror No. 3. Defense counsel objected and stated that both Stafford and Juror No. 3 were African-American males of a certain age group. Defense counsel stated that Juror No. 3 was "[r]eally the only peer he's got on the jury."
 {¶ 52} The burden then shifted to the State to provide a race-neutral explanation for the preemptory challenge. The prosecutor stated that
 "[t]he reason the State is asking to excuse [Juror No. 3] is that he gave several answers that concern the State in his voir dire. I did have the opportunity to have an extensive back and forth with him and he indicated that at one point actually he would need proof beyond all doubt, he would need physical evidence in order to convict, and that witnesses lie. Those statements concern me."
 {¶ 53} "As the trial court is in the best position to judge the credibility of the attorney during a Batson challenge, this court reviews the trial court's determination as to a Batson challenge under a clearly erroneous standard." Jones, supra, at ¶ 29, citingHernandez, 500 U.S. at 369. In explaining its decision, the trial court stated:
 "The Court had an opportunity to see the voir dire process between [the prosecutor] and [Juror No. 3]. There were times when it did seem to be uncomfortable for both parties. The State did not exercise any peremptories on any other of the minority jurors and the Court, based on its observations here in court, does not feel that there is a bias on the State in excusing [Juror No. 3] and therefore is satisfied with the State's explanation as to the race-neutral reasons for excusing him." *Page 18 
We do not think that the trial court's finding was clearly erroneous in this case. Therefore, Stafford's third assignment of error is overruled.
 III. {¶ 54} Stafford's assignments of error are overruled and the judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
 DICKINSON, J. WHITMORE, J. CONCUR. *Page 1