[Cite as *State v. Gregory*, 2020-Ohio-5207.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28695 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-2286/1 |
| | : | |
| KYLEN GREGORY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 6th day of November, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
   Attorney for Plaintiff-Appellee

BEN M. SWIFT, Atty. Reg. No. 0065745, P.O. Box 49637, Dayton, Ohio 45449
   Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Kylen Gregory appeals from a reverse bindover decision in which the juvenile court concluded that Gregory was not amenable to rehabilitation in the juvenile system after he was convicted in adult court of murder, felonious assaults, discharge of a firearm on or near a prohibited premises, and a firearm specification. According to Gregory, the juvenile court abused its discretion in finding a lack of amenability because the court made errors in factfinding. In addition, Gregory contends that the juvenile court's decision was against the manifest weight of the evidence.

{¶ 2} We conclude that the juvenile court did not abuse its discretion in making certain factual findings concerning Gregory's amenability for rehabilitation within the juvenile system. Although the court's finding concerning one factor in R.C. 2152.12(D) was incorrect, any error was harmless, as it involved a minor point, and the court relied more heavily on other factors, including a psychological evaluation of Gregory. Furthermore, the court's decision that Gregory was not amenable to rehabilitation in the juvenile system was not an abuse of discretion, nor was it against the manifest weight of the evidence. Accordingly, the judgment will be affirmed.[1]

I. Facts and Course of Proceedings

{¶ 3} This case arises from a series of events that began on September 3, 2016, when Gregory stole a Smith & Wesson revolver and six bullets from his grandfather's house. At the time, Gregory was 16 years old and was a sophomore at Fairmont High

---

[1] Gregory filed a notice of appeal from the trial court's December 31. 2019 order imposing the adult sentence after the case was remanded to adult court. However, Gregory has not raised any issues pertaining to the adult court case; his sole assignments of error are directed to the juvenile court's bindover decision.

School in Kettering, Ohio. When Gregory stole the gun, he loaded the bullets into the gun and placed it in an overnight bag. The next day, Gregory took the gun to his house in Kettering, and then took it to Kanter Park in Kettering, where he met with several friends. According to Gregory's trial testimony, he intended to sell the gun to a friend. Because the friend did not have the money for the gun, Gregory then took the gun to the Alterfest festival, which he had previously planned to attend with his friends. Trial Transcript (Adult Tr.), p. 461-462, 478, and 481-483.

{¶ 4} Gregory was part of a friend group or gang called BSK or GLO. This gang was prominent in Kettering and was known as a bunch of boys who did bad things. BSK referred to the streets (Beaver, Sutton, and Kanter) where some members lived, and GLO referred to the initials of a member who had previously died from gun violence. Amenability Hearing Transcript ("Amenability Tr."), p. 18, 33, 34, 35, 45, 155, and 188. The members of BSK/GLO were M.K., Jerry Tanner, Kylen Gregory, and Miles Heizer. *Id.* at p. 34.[2] Tanner had an ongoing problem with Cameron Wilson since June 2016, because Wilson had sold marijuana to Tanner's girlfriend and did not give her the correct amount. *Id.* at p. 31-32.

{¶ 5} Wilson also attended Alterfest on September 4, 2016, with a group of his friends. On that day, R.B. and Wilson picked up M.M. and J.T. at J.T.'s house around 6:30 p.m.[3] They then went to an apartment complex so that Wilson could buy marijuana.

---

[2] Because more than four years have passed since the incident, nearly all the participants are adults now. However, one individual in BSK/GLO was only 14 at the time and may still be a juvenile. As a result, we will use initials to protect his privacy.

[3] We are also using initials for the driver of the car and two occupants, because they were minors at the time of the crime and may have still been minors at the time of the amenability hearing.

While there, the four smoked marijuana and then left for Alterfest about a half-hour later. They arrived at Alterfest at 7:00 or 7:30 p.m.   Adult Tr. at p. 182-186.   R.B. parked the car on Willowdale Drive, which was in the area of the festival.   Amenability Tr. at p. 24-25.

{¶ 6} Very shortly after arriving at the festival, Wilson encountered Tanner, Gregory, and M.K., who were dressed in all white clothing.   *Id.* at p. 21.   Tanner and M.K. confronted Wilson and wanted to fight him, but Wilson refused.   Adult Tr. p. 102, 270, and 329.   When Wilson said he did not want to fight, both groups walked away from each other.   *Id.* at p. 103 and 330.   After the altercation, Wilson told his friends that they needed to leave, and they began walking to where R.B. had parked the car.   Wilson saw someone following them, so he told R.B. to run to the car; they then did so.   The girls (M.M. and J.T.) were following behind them, walking at a slower pace.   Amenability Tr. at p. 23 and 157.

{¶ 7} The people following Wilson included C.H., who was Heizer's younger brother.   *Id.* at p. 157.[4]   C.H. called Heizer to tell him where Wilson was headed, and Heizer, Gregory, Tanner, M.K., and a person named "Chicago" then went to Heizer's car, which was parked closer to the festival.   Adult Tr. at p. 333.   They eventually found C.H. and his friend, who pointed them to Willowdale Drive.   *Id.* at p. 242.   The people in Heizer's car anticipated that they were going to a fight.   *Id.* at p. 91, 104, and 467.

{¶ 8} In the meantime, Wilson, R.B, M.M., and J.T. had gotten in R.B.'s car, and R.B. had driven up into a driveway at 808 Willowdale, with the intent to turn around.   *Id.*

---

[4]  This individual's age is unknown, so we will use his initials as well.

at 192. However, Heizer went behind R.B.'s car to try to block him. *Id.* at p. 106. At that point, people in Heizer's car got out and began banging on the front windows of R.B.'s car, attempting to get Wilson out of the car. R.B. was able to reverse and get out of the driveway because it was not totally blocked. However, as R.B. tried to drive away, Gregory shot at the vehicle. *Id.* at p. 107, 195, 276.

{¶ 9} The shot hit R.B., and he slumped into Wilson's lap. At that point, the car was still moving, going toward houses and a tree. Wilson then grabbed the wheel, pressed the brake, and the car stopped. Both J.T. and M.M. had jumped from the car. Wilson exited the car and ran from the scene because he was afraid he would be pursued. He eventually took shelter at a nearby home where a friend of M.M. lived. The police were then called. Adult Tr. at p. 201-293, 278-290, 341, 345, and 471; Amenability Tr. at p. 28 and 160. When M.M. jumped from the car, the boys from Heizer's car were chanting and yelling. M.M. could not tell what they were saying, but the tone was " 'yeah,' like I just did that, like 'yeah,' hyping it up." Amenability Tr. at p. 162.

{¶ 10} The bullet penetrated the glass in the car's rear window, went through the headliner, which was composed of foam, fabric, and cardboard, skimmed across the car's interior roof, and came downward, striking R.B. in the right side of the back of his head. Although R.B. was transported to the hospital, he died two days later, with the cause of death being a gunshot wound to the head. Adult Tr. at p. 24, 52, 390, and 392. There was no indication that any of the people involved in the pursuit and shooting knew R.B. before that night. *Id.* at p. 329 and 460; Amenability Tr. at p. 41.

{¶ 11} After the shooting, Gregory went home, changed from a white shirt to a dark

shirt, put a cast on his arm, and returned to the festival.    Adult Tr. at p. 420-422 and 476.[5]

Tanner took the gun with him, cleaned it, and hid it in a trashcan in the laundromat in his apartment building.    *Id.* at p. 347-349.

{¶ 12} On September 6, 2016, a complaint for felonious assault was filed in juvenile court, alleging that Gregory was delinquent due to having knowingly caused physical harm to R.B.    Gregory was then remanded to juvenile custody.    On October 26, 2016, the State filed an amended complaint, adding charges for murder, with a three-year firearm specification; felonious assault (deadly weapon), with a three-year firearm specification; felonious assault (serious physical harm), with a three-year firearm specification); discharge of a firearm on or near prohibited premises (causing serious physical harm); and grand theft of a firearm.    The State also filed a motion to transfer the case to adult court under both mandatory and discretionary transfer statutes.

{¶ 13}   After holding a probable cause hearing, the juvenile court filed a decision on February 7, 2017, concluding that probable cause existed to believe that Gregory had committed the alleged offenses.    The court then ordered a mental examination and a social history investigation, and it scheduled an amenability hearing for April 7, 2017.    In addition, the court granted a defense request for an independent amenability evaluation. The court then held an amenability hearing on May 24, 2017, but continued the hearing for presentation of further testimony.

{¶ 14} However, before the hearing process could be concluded, the State filed another motion to transfer Gregory to adult court.    This motion was based on a change

---

[5] The cast was a removable one that Gregory had gotten due to an injury.    Amenability Tr. at p. 72.

in Ohio jurisprudence, which previously had held that mandatory transfer of a juvenile to adult court violates due process. *See State v. Aalim*, 150 Ohio St.3d 463, 2016-Ohio-8278, 83 N.E.3d 862, paragraph one of the syllabus. That decision was vacated on reconsideration in *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, which was issued on May 25, 2017. Based on the fact that mandatory transfer was now allowed, the State argued that Gregory's transfer to adult court was required. The juvenile court agreed, and on July 20, 2017, granted the State's motion for an immediate transfer to adult court.

{¶ 15} Gregory appealed from that decision on August 10, 2017, but then voluntarily dismissed the appeal on October 6, 2017. Previously, an indictment had been filed in the common pleas court on August 8, 2017, charging Gregory with two counts of murder, one count of discharge of a firearm on or near prohibited premises, and five counts of felonious assault (two counts relating to R.B. and the other three relating to the other individuals in the car). All counts included firearm specifications.

{¶ 16} In November 2018, a jury trial took place in the common pleas court. The jury found Gregory guilty of two counts of reckless homicide as a lesser included offense of the murder charges and discharge of a firearm on or near a prohibited premises (causing serious physical harm), along with the attendant firearm specifications to these charges. The jury was unable to reach a verdict on the remaining charges, and a new trial was scheduled. However, on April 23, 2019, Gregory pled guilty to five counts of felonious assault, and, by agreement, the State dismissed the remaining firearm specifications. *See* Entry of Waiver and Plea.

{¶ 17} After merging the offenses and firearm specifications, the trial court

sentenced Gregory to a total of 11 years in prison, including a mandatory three-year sentence for the firearm specification. The court also credited Gregory with 1,012 days of confinement as of the sentencing date of June 13, 2019. And finally, the court stayed its sentence pursuant to R.C. 2152.121 and transferred the case back to juvenile court for further "reverse bindover" proceedings, noting that the charges of which Gregory was convicted were different from the charges originally filed in the juvenile court and would have allowed discretionary transfer but would not have required mandatory transfer to the adult court. Judgment of Conviction, p. 3.

{¶ 18} After the case was transferred back to juvenile court, the State filed an objection to imposition of a serious youthful offender ("SYO") disposition sentence and asked the court to conduct an amenability hearing. The juvenile court then ordered updates of the prior psychological reports and the probation department's court investigation report ("CIR"). In addition, the court scheduled an amenability hearing for October 7, 2019. During the amenability hearing, which began on that day and ended the next day, the court heard testimony from the following witnesses: Cameron Wilson; Dr. Laura Fujimura, court psychologist for the Montgomery County Juvenile Court; M.M.; Dr. Daniel Davis, who conducted an independent psychological evaluation; and Michael Wallace, a youth specialist who was employed with the Montgomery County Juvenile Detention Center.

{¶ 19} Additionally, the parties stipulated to the admission of several joint exhibits: Ex. 1 (trial testimony from the Montgomery County Common Pleas Court case); Ex. 2A (Juvenile Detention Records for 2016); Ex. 2B (Juvenile Detention Records for 2017); Ex. 2C (Juvenile Detention Records for 2018); Ex. 2D (Juvenile Detention Records for 2019

through August 29, 2019); Ex. 3 (Dr. Fujimura's psychological report); Ex. 4 (Dr. Davis's psychological report); and Ex. 5 (the CIR).

{¶ 20} After considering the evidence, the juvenile court filed an order on December 4, 2019, concluding that Gregory was not amenable to rehabilitation in the juvenile system and that community safety required that Gregory be subjected solely to adult sanctions. Gregory then filed a notice of appeal on January 29, 2020, and later asked for the appeal to be expedited. We sustained Gregory's request for expedition on March 18, 2020. On June 11, 2020, we also ordered that the record be supplemented with the docket and journal entries from the juvenile court proceedings. Accordingly, the appeal is ready for disposition.

## II. Abuse of Discretion in Finding Lack of Amenability

{¶ 21} Gregory's First Assignment of Error states that:

The Juvenile Court Abused Its Discretion in Finding a Lack of Amenability to Rehabilitation in the Juvenile Justice System Through Errors in Factfinding.

{¶ 22} The juvenile court concluded that Gregory was not amenable to rehabilitation in the juvenile system. Gregory contends that the court abused its discretion in this regard because it made errors in factfinding. According to Gregory, the court erred in finding that Gregory's relationship with R.B. facilitated the homicide; that Gregory committed the charged act for hire or as part of a gang or other organized criminal activity; that there was no provocation for the crime; and that Gregory's actions exacerbated the physical or psychological harm the victim suffered due to the victim's

physical or psychological vulnerability. The State acknowledges that the juvenile court may have misconstrued the meaning of facilitating an offense. However, the State argues that this matter was irrelevant due to the presence of other seriousness factors. Appellee's Brief, p. 18.

{¶ 23} There is no question that this was a reverse bindover situation under R.C. 2152.121(B)(3) and that the procedures under that section of the statute applied. In cases where, as here, the State objects to an SYO disposition, "the juvenile court shall hold a hearing to determine whether the child is not amenable to care or rehabilitation within the juvenile system and whether the safety of the community may require that the child be subject solely to adult sanctions." R.C. 2152.121(B)(3)(b). In making this decision, "the juvenile court shall consider the factors listed in division (D) of section 2152.12 of the Revised Code as factors indicating that the motion should be granted, shall consider the factors listed in division (E) of that section as factors indicating that the motion should not be granted, and shall consider whether the applicable factors listed in division (D) of that section outweigh the applicable factors listed in division (E) of that section." *Id.* "If the juvenile court grants the motion of the prosecuting attorney under this division, the juvenile court shall transfer jurisdiction of the case back to the court in which the child was convicted of or pleaded guilty to the offense, and the sentence imposed by that court shall be invoked." *Id.*

{¶ 24} The factors in R.C. 2152.12(D) favoring transfer are as follows:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to

the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

{¶ 25} In this case, the juvenile court concluded that factors (1), (2), (3), (4), (5), (7), (8), and (9) favored transfer. The factors weighing against transfer in R.C. 2152.12(E) include the following items, as well as any other factors weighing against transfer:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

{¶ 26} The only factor the court found that potentially weighed against transfer was (5). However, even on this point, the court assigned only a neutral value to the factor. Judge's Order (Dec. 4, 2019), p. 11.

{¶ 27} Juvenile court decisions on "a child's amenability to rehabilitation in the juvenile system" are reviewed for an abuse of discretion. *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 14. An abuse of discretion is "an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community*

*Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). We have often said that "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* Furthermore, decisions are unreasonable if they are unsupported by a sound reasoning process. "It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 28} In considering this appeal, we have read the entirety of the voluminous juvenile record, which includes the amenability hearing transcript, the adult court trial transcript, the psychological evaluations of Gregory, the juvenile court investigation report, and three years of daily documentation regarding Gregory's conduct during juvenile detention. These latter records, in particular, provide an extensive look at Gregory's conduct and progress while in detention.

{¶ 29} After reviewing the record, we find no abuse of discretion due to alleged errors in the juvenile court's factfinding. The court considered the appropriate statutory factors, and the record contains "some rational and factual basis" to support its findings concerning those factors. *State v. Howard*, 2d Dist. Montgomery No. 17298, 2018-Ohio-1863, ¶ 15-16, quoting *State v. West*, 167 Ohio App.3d 598, 2006-Ohio-3518, 856 N.E.2d 285, ¶ 10 (4th Dist.). *See also State v. Hoskins*, 2d Dist. Montgomery Nos. 27486 and 27487, 2018-Ohio-4529, ¶ 17. Under the abuse of discretion standard, "a juvenile court ' "enjoys wide latitude to retain or to relinquish jurisdiction." ' " *Howard* at ¶ 15, quoting *State v. Johnson*, 2015-Ohio-96, 27 N.E.3d 9, ¶ 36 (8th Dist.). (Other citations omitted.)

{¶ 30} In *Howard*, we further stressed that " 'the test is not whether we would have

reached the same result upon the evidence before the juvenile court; the test is whether the juvenile court abused the discretion confided in it.' " *Id.* at ¶ 16, quoting *State v. Hopfer*, 112 Ohio App.3d 521, 535, 679 N.E.2d 321 (2d Dist.1996). "If there is some rational and factual basis to support the [juvenile] court's decision, we are duty bound to affirm it regardless of our personal views of the evidence." *Id.*, citing *West* at ¶ 10. " 'After all, the juvenile court judge is personally familiar with both the juvenile system and the individual juvenile and is therefore in a superior position to make a determination whether the juvenile is amenable to care or rehabilitation within the juvenile system.' " *Id.*, quoting *State v. Drane*, 2d Dist. Montgomery No. 23862, 2012-Ohio-1978, ¶ 34 (Fain, J., dissenting).

**{¶ 31}** As a preliminary point, we do agree that the juvenile court misconstrued the meaning of facilitating an offense under R.C. 2152.12(D)(3). "To facilitate means to make easier. The American Heritage Dictionary (2 Ed.1985) 484. In order to have the relationship facilitate the offense, the defendant must have used his relationship with the victim to help commit the offense." *State v. Manley*, 3d Dist. Allen No. 1-11-04, 2011-Ohio-5082, ¶ 20, citing *State v. McDade*, 6th Dist. Ottawa Nos. OT-06-001, OT-06-004, 2007-Ohio-749. "In other words, the defendant must have used the relationship to allow him to commit the offense in a manner which he could not have accomplished without the relationship." *Id.* Here, R.B. and Gregory had no relationship; in fact, they did not even know each other. R.B. was simply an unfortunate bystander who was tragically killed as a result of Gregory's actions.

**{¶ 32}** Nonetheless, the court's error in this regard was not prejudicial. As an initial point, R.C. 2152.12 does not specify the weight to be given to any particular factor.

Instead, the ultimate decision rests with the juvenile court. *State v. Morgan*, 10th Dist. Franklin No. 13AP-620, 2014-Ohio-5661, ¶ 37. *Accord State v. Lavender*, 2019-Ohio-5352, 141 N.E.3d 1000, ¶ 139 (1st Dist.). Furthermore, the doctrine is well-settled that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). "This language has been interpreted to 'mean[ ] that the error must have been *prejudicial*: It must have affected the outcome of the [trial] court proceedings.' " (Emphasis and parenthetical material sic.) *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

**{¶ 33}** Our review of the record indicates no possibility that the error affected the outcome of the amenability proceeding. The juvenile court found transfer appropriate based on many factors, and its decision appears to have relied most heavily on the psychological evaluation and opinions of Dr. Fujimura, whom the court specifically found persuasive. Judge's Order (Dec. 4, 2019), p. 8.

**{¶ 34}** Gregory also contends that the court erred in concluding that he committed the charged act for hire or as part of a gang or other organized criminal activity. See R.C. 2152.12(D)(4). The statute does not define "gang," and Gregory argues we should apply the definition of a gang stated by an expert in *State v. Stafford*, 9th Dist. Summit No. 24144, 2009-Ohio-701. In that case, a police officer stated that " '[w]ithin Ohio a gang is a group of three or more persons that go about together with a common name and one or more common identifying signs, symbols or colors and their main purpose is to commit criminal activity.' " *Id.* at ¶ 28.

**{¶ 35}** We decline the invitation. *Stafford* involved prosecution of a specific crime,

R.C. 2923.42(A), which bars participation in criminal gang activity. R.C. 2923.42(A) provides, in pertinent part, that:

> No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code.

{¶ 36} The State was not required to prove that Gregory met the requirements of this crime, nor did the juvenile court need to apply R.C. 2923.42 in order to find that Gregory's acts were committed as part of a gang. However, even if one were guided by the statute and the case that Gregory cites, there was some rational and factual evidence in the record to support the conclusion that Gregory's action was part of gang activity.

{¶ 37} Specifically, there was evidence that Gregory, Tanner, M.H., and Heizer were members of a prominent gang in Kettering called GLO or BSK that was known for doing bad things. Amenability Tr. at p. 18-20, 33, 34, 155, and 188. As noted, one of the members had previously died as a result of gun violence. *Id*. at p. 45. The members of the group also appeared in all white clothing at the festival and challenged Cameron Wilson to a fight based on an ongoing "beef" with him. When Wilson refused to fight, the members of the gang pursued Wilson and his friends, believing a fight was going to occur. *Id*. at p. 19. *See also* Adult Tr. at p. 91, 102, 104, 270, and 329. And, in the course of that fight, Gregory discharged his weapon at the car – an action that can certainly be

described as being intended to intimidate others. Thus, some rational and factual evidence existed in the record to warrant the juvenile court's conclusion that R.C. 2152.12(D)(4) supported transfer.

{¶ 38} Gregory also argues that the court erred in concluding that the victim did not induce or facilitate the charged act, and that he acted under provocation. Appellant's Brief, p. 11-12. This argument relates to R.C. 2152.12(D)(3) and (E)(2). In this vein, Gregory focuses on the fact that an ongoing "beef" existed between Wilson and Tanner, due to the fact that Wilson had "shorted" Tanner's girlfriend when selling her marijuana, that other persons outside the BSK/GLO group may have had an altercation with Wilson about his problem with Tanner, and that Wilson had an Airsoft gun in R.B.'s car the evening of the incident. *Id.* at p. 12.

{¶ 39} The undisputed evidence discussed in the statement of facts clearly indicated that Wilson refused to fight with anyone the evening of the incident and attempted to flee – which he was prevented from successfully doing. More importantly, the other victims in the car were completely innocent bystanders with no connection to any ongoing feud between Wilson and the GLO/BSK group. There was not an iota of evidence to support the contention that the victims provoked Gregory or that he acted under provocation of any kind.

{¶ 40} Finally, Gregory takes issue with the juvenile court's finding that his actions exacerbated the physical or psychological harm the victims suffered due to the victim's physical or psychological vulnerability. This factor relates to R.C. 2152.12(D)(2), which indicates that a factor favoring transfer is that "[t]he physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the

physical or psychological vulnerability or the age of the victim."

{¶ 41} According to Gregory, the record fails to disclose that "any of the victims were psychologically or physically infirm or that they were impaired at the time of the incident." In this regard, Gregory focuses solely on the juvenile court's comment that "[s]uch events would be a traumatic experience for anyone, especially adolescents." Appellant's Brief at p. 12.

{¶ 42} In discussing this factor, the juvenile court remarked that:

The victims were teenagers in 2016. They were confronted by a hostile group of four individuals. They were followed and tracked by the initial hostile group of four as well as two other youths associated with that group as they tried to retreat. Their escape was prevented when they were trapped in a residential driveway by the hostile group, who surrounded their vehicle yelling, striking, and rocking the vehicle. Three of them witnessed a friend shot in the back of the head as he tried to maneuver his vehicle away from the danger. Three victims bailed out of a moving vehicle and a storm of glass to the soundtrack of a gunshot and a hostile group yelling and celebrating the victims' fear. They then hid behind a house and trees. Such events would be a traumatic experience for anyone, especially adolescents.

R.B. was only sixteen years old when he lost his life. While the loss of any life is tragic, R.B.'s age amplifies the tragedy.

Judge's Order (Dec. 4, 2019), p. 4.

{¶ 43} What Gregory fails to mention is that age, and not just physical or

psychological vulnerability – is specifically mentioned in R.C. 2152.12(D)(2). The juvenile court therefore appropriately considered the impact of the victims' ages. We also note that one victim, M.M., indicated that she had been very affected, had missed many days of school, went to counseling, and took anti-depressant pills. Amenability Tr. at p. 163. M.M. further said that she thought about the incident every day. *Id.* Accordingly, the juvenile court did not err in factfinding concerning this factor.

{¶ 44} Based on the preceding discussion, we find no abuse of discretion that resulted from the juvenile court's alleged erroneous factfinding. The First Assignment of Error, therefore, is overruled.

## III. Manifest Weight

{¶ 45} Gregory's Second Assignment of Error states that:

The Juvenile Court Abused Its Discretion in Finding a Lack of Amenability to Rehabilitation in the Juvenile Justice System, as the Decision is Against the Manifest Weight of the Evidence.

{¶ 46} In discussing this assignment of error, Gregory incorporates the arguments he has previously made and contends that, based on the court's faulty analysis, the court was unfairly skewed against amenability. Since we have found that the court's analysis was mostly correct, there is no basis on which to conclude that the court's decision was unfairly skewed by incorrect factfinding.

{¶ 47} Gregory's next point is that the juvenile court improperly ignored his achievements and rehabilitative progress during three years of incarceration. In this regard, Gregory focuses on positive testimony from a youth specialist, Gregory's own lack

of violence or fights during detention, the fact that he has always attained a level three behavioral status (the highest level available), the fact that his disciplinary problems "primarily involve issues such as being silly, dancing in class, horseplay or having contraband," his expression of regret for his wrongdoing, the fact that his misconduct began in late school age and early adolescence, which has the prospect of a better outcome and less likelihood of remaining persistent in adulthood, the fact that he is close to achieving his high school diploma, and the fact that his behavioral issues have decreased over time.   Appellant's Brief at p. 14-18.

{¶ 48} Before addressing these matters, we note that a few decisions have applied a manifest weight standard to amenability issues.   *See State v. Davis*, 11th Dist. Lake No. 2002-L-127, 2003-Ohio-6741, ¶ 31; *State v. Early*, 6th Dist. Lucas No. L-84-339, 1985 WL 7059, *2 (Mar. 1, 1985).   However, the general standard for reviewing amenability decisions is whether the juvenile court abused its discretion.   *E.g.*, *M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, at ¶ 14.   And again, the issue is whether the record contains some rational and factual basis to support the court's findings.   *Howard*, 2d Dist. Montgomery No. 17298, 2018-Ohio-1863, at ¶ 15-16.   Regardless of the standard applied, however, reversing the juvenile court's decision in this case is unjustified for several reasons.

{¶ 49} As indicated, Gregory contends that the juvenile court ignored his achievements and rehabilitative progress while in detention.   The court did not discuss the detention record in great detail; instead, it primarily relied on the psychological evaluation and testimony of Dr. Fujimura, who did discuss Gregory's conduct during detention.   The court also rejected Dr. Davis's opinion that Gregory was already on his

way to rehabilitation, stating that Davis's opinion appeared "to have been based on a very small percentage" of Gregory's negative detention log notations.    Judge's Order, Dec. 4, 2019) p. 13.

{¶ 50} Under settled law, the juvenile court could disregard any part of these doctors' testimony or could assign any weight to the testimony.    *State v. Nicholas*, 2d Dist. Champaign No. 2018-CA-25, 2020-Ohio-3478, ¶ 67, citing *State v. Easley*, 10th Dist. Franklin No. 16AP-9, 2016-Ohio-7271, ¶ 15.

{¶ 51}   Dr. Fujimura is a court psychologist for the Montgomery County Juvenile Court.    She has been employed by the court for 29 years, and part of her job is evaluating youth for amenability.    Amenability Tr. at p. 47-48.    Dr. Fujimura evaluated Gregory in 2017 concerning the pending charges, and again in 2019.    *Id.* at p. 49.    According to Dr. Fujimura, evaluating someone who has been in custody for three years is unusual and gave her additional helpful information she might not usually have, primarily because the detention facility keeps daily logs of a youth's behavior, with a running narrative of services provided and how the youth responded.    The logs also note any discipline problems and suggestions for future beneficial services.    *Id.* at p. 51.

{¶ 52} The format of the detention program was called "Positive Behavior Interventions and Support," during which youths participate in programs, focus on their positive actions, and earn points to progress through levels.    *Id.* at p. 52.    Another strong component is education, with a full staff of teachers who help youths earn high school diplomas during detention.    *Id.* at p. 53.    Among the other services available to Gregory were a full mental health program, a psychiatrist on staff to assess youths and prescribe medication, and treatment staff to provide individual and group counseling.    *Id.* at p. 53-

54.

{¶ 53} Gregory entered detention when he was 16 years old and a sophomore in high school. Before the incident, he had a "very problematic history starting in middle school through high school with a lot of discipline referrals for disrespectful and disruptive behaviors, often resulting in disciplinary action." *Id.* at p. 56. Both before and after detention, Gregory had incidences of not doing his work in school, being disruptive in class, and being disrespectful to teachers. *Id.* at p. 56-67. The length of Gregory's misconduct and similar behavior caused Dr. Fujimura concern over his amenability. *Id.* at p. 57. Specifically, despite all the services provided and family support, Gregory was still exhibiting the same issues during detention. *Id.* at p. 58. Moreover, while Gregory was a sophomore when he came into detention, he was not able to attain his high school diploma in three years. At age 19 and one-half, Gregory was still three courses short of attaining a high school diploma. *Id.*

{¶ 54} During detention, Gregory had about 336 verbal corrections and about 15 discipline reports. *Id.* at p. 61. The daily logs given to the juvenile court for review contained entries from September 5, 2016, when Gregory was first taken into detention, through August 29, 2019, when Gregory was almost 19 and a half years old. See Joint Exs. 2A-2D.[6]

{¶ 55} It is true, as Gregory suggests, that many of his discipline referrals were for issues like being silly, dancing, and horseplay. However, a substantial number of

---

[6] The amenability hearing began on October 7, 2019. Dr. Fujimura also indicated that on September 5, 2019, Gregory was written up for having major contraband. While the objects were just two pieces of gum, Gregory was openly breaking the rules; this was consistent with Gregory's having been disciplined many times for having contraband in his room. Amenability Tr. at p. 77-78.

discipline referrals were for being disrespectful of staff and others. Furthermore, issues concerning disrespect persisted throughout the entire period of detention. *E.g.*, October 27, 2016 ("Corrected for arguing with staff"); November 14, 2016 ("Corrected for trying to argue with this Y/S [youth specialist] about changing his room"); December 14, 2016 ("Seems to have no regard for rules of detention and likes to argue with staff/peers"); April 3, 2017 ("Sent out of class for lack of participation and verbally assaulting YS"); May 10, 2017 ("sent out of gym for not following directions"; "Corrected for arguing with peer"); July 7, 2017 ("corrected for being disrespectful towards the Youth Specialist and others on the unit"); October 10, 2017 ("sent from class for arguing with teacher"); November 11, 2017 ("corrected for disrespecting staff"); December 21, 2017 ("corrected for disrespecting Y/S Mr. Wallace); March 25, 2018 ("received T/O [time-out] for being disrespectful"); April 10, 2018 ("Corrected for * * * arguing with Ms. Young in class"); May 1, 2018 ("Corrected for mocking Y/S when correcting another youth['s] behavior"); June 21, 2018 ("Corrected for telling teacher what he [Gregory] is not going to do"); July 23, 2018 ("Corrected for his poor attitude toward Y/S"); August 29, 2018 ("Corrected for trying to debate directions with teachers"); October 1, 2018 ("Sent out of class for trying to argue with Ms. Tomlin"); November 19, 2018 ("Sent out of class for being disrespectful"); January 20, 2019 ("Corrected for talking back to Y/S"); April 4, 2019 ("Y/S warned him about his disrespectful behavior"); April 25, 2019 ("Corrected for silly behavior on G/M laughing loudly when told he would be sent to his room he said I want to rest anyway"); August 28, 2019 ("Sent out of class for talking back to Ms. Tomlin and getting out of chair without permission. Fined 100 points today"). Joint Exs. 2A-2D.

{¶ 56} As indicated, these are but some of the infractions. Furthermore, while a

particular infraction, like being silly, might not be major, the fact that such behavior continued repeatedly over three years, despite correction, indicated Gregory's lack of respect for rules and a failure to conform his behavior after correction. For example, Gregory was corrected for "silly" behavior about 57 times between November 2016 and May 2019. Joint Exs. 2A-2D. He was corrected for having sagging pants 27 times between February 2017 and March 2019. *Id.* On September 25, 2016, shortly after he entered detention, Gregory was corrected for cursing or using foul language. He thereafter had 63 more such violations between then and May 3, 2019. *Id.*

**{¶ 57}** It is true that Gregory had fewer discipline referrals after his case was returned to juvenile court following the sentencing in the trial court. However, Dr. Fujimura noted that Gregory had been described as sneaky and manipulative during detention, that he presented himself in different ways to different people, and that getting accurate answers from him was difficult. Amenability Tr. at p. 69, 76, and 79. Regarding manipulation, Gregory told Dr. Fujimura during her second evaluation that he would prefer to stay in the juvenile system because he had heard he could get out when he was 21. She ascribed his improvement in behavior in recent months to his realization that he would have less time and less consequences if he stayed in the juvenile system. *Id.* at p. 85.

**{¶ 58}** Given Gregory's failure to provide accurate information, Dr. Fujimura stated that she was concerned about his amenability to being treated successfully within the system and within the time before he turned 21. In this regard, the doctor stressed that:

> If the information that Kylen gives changes, is not complete, if there's
>
> denial or difficulties, it's going to make it really difficult to come up with

accurate treatment.

Over the past three years, he's had many opportunities to speak with many different staff people, teachers, therapists, psychiatrists, detention staff, and under this detention program, they look for the positives. Regardless of what charges the youths come in with, the staff look for the positives. They encourage the positives. They really work very hard with the youths to give them every possible opportunity. Teachers offered many times to work with Kylen individually, and he still was not able to complete his work.

So given that, with all of this opportunity, if Kylen doesn't choose to be accurate with the information to really step up to the plate and say, I have those issues, * * * I really want to get the help – if he doesn't do that, no treatment is going to be effective.

Amenability Tr. at p. 70.

{¶ 59} Dr. Fujimura also expressed concerns over community safety if Gregory were kept within the juvenile system and then released, stating that:

Combining the logs with his reports, it still shows he tends to underestimate. He's told his probation officer, I haven't been getting into trouble. I look at the logs and see that he has been having problems.

He would tell the psychiatrist, I'm not having any issues in – with my behavior, but that wasn't the case. So I was able to compare with that.

If he's not been forthright and he's manipulative and he's not engaging in treatment and he's selective with what he's telling people, it's

hard to get an accurate assessment of risk. It's hard to get an accurate assessment of what treatment he needs or how long it will be effective." Amenability Tr. at p. 71.

{¶ 60} Based on what Dr. Fujimura reviewed and observed, she diagnosed Gregory with oppositional defiance disorder and conduct disorder. *Id.* at p. 103-105. Her opinion, based on a reasonable degree of psychological probability, was that Gregory had "the ability to participate in treatment and do well academically," but was not "amenable to treatment services in the juvenile justice system based on his own behaviors." *Id.* at p. 111.

{¶ 61} In light of the above discussion, we conclude that substantial, not just *some* rational and factual evidence, supported the juvenile court's remand decision. *Howard*, 2d Dist. Montgomery No. 17298, 2018-Ohio-1863, at ¶ 15-16. Furthermore, the court was not required to accept the testimony of any witness. "The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact." *State v. Anderson*, 2015-Ohio-888, 30 N.E.3d 176, ¶ 39 (5th Dist.). As a result, the court did not have to credit the testimony of Michael Wallace, who was one of Gregory's youth supervisors.

{¶ 62} In addition, without casting any aspersion whatsoever on Wallace's credibility, the fact is that Wallace was not with Gregory all the time; he was simply one of many youth supervisors and teachers. As Dr. Fujimura noted, Gregory presented himself in different ways to different people.

{¶ 63} In addition, Wallace's testimony was simply incorrect in some respects. For example, Wallace testified that Gregory always wore a black shirt, and that Gregory

had always been a "level three," which is the best behavior level. Amenability Tr. at p. 300. According to Wallace, a yellow shirt is worn for level one, an orange shirt is worn for level two, and a black shirt is worn for level three. Level three is for the best behavior, while level one is for the worst behavior. *Id.*

{¶ 64} Contrary to Wallace's statement, however, Gregory was at a level one or level two behavior for the majority of the time he was in detention. *See* Joint Ex. 2A-2D. As one example, Gregory was reduced from level two to level one on July 4, 2018, for instigating a fight with another youth. He remained at level one until July 30, 2018. In the meantime, Gregory had some other major disciplinary problems, like instigating a fight/horseplay on July 7, 2018, possessing contraband on July 14, 2018, and talking, on July 19, 2018, about a television show that taught people how to escape. After going back to level two on July 30, 2018, Gregory was again returned to level one on September 6, 2018, for having contraband. *Id.* at Ex. 2C.

{¶ 65} In fact, Gregory did not reach level three until October 28, 2018, which was more than two years after he entered confinement. *Id.* He then remained on level three until July 24, 2019, when he was reduced to level one for having contraband. *Id.* at Ex. 2D. Ironically, this infraction occurred on the same day that Gregory met with a probation officer who was conducting the court investigation for the amenability hearing. This officer met with Gregory at 10:00 a.m. and explained that he would be preparing a court investigation for the upcoming hearing. The officer also encouraged Gregory to make good choices, avoid any conflict, and follow the detention rules. *Id.*

{¶ 66} However, later that day, during the second shift, which is from 3:00 p.m. to 11:00 p.m., Gregory received a fine for contraband and was reduced to a level one. *Id.*

Gregory also was written up for major contraband on September 5, 2019, about a month before the amenability hearing began.

{¶ 67} There is no question that some progress toward rehabilitation occurred during the three years that Gregory was in detention. Dr. Fujimura acknowledged that in some ways, Gregory had made progress. Amenability Tr. at p. 65. Nonetheless, for the reasons discussed above, she did not believe adequate time remained for Gregory to be successfully treated and rehabilitated within the juvenile system.

{¶ 68} Like Dr. Fujimura, Dr. Davis diagnosed Gregory with oppositional defiant disorder and adolescent onset conduct disorder. *Id.* at p. 176. While Dr. Davis found that the scale tipped toward amenability, his opinion could reasonably be classified as only lukewarm. *Id.* at p. 181. Dr. Davis agreed with Dr. Fujimura that "the extent [to which] Kylen decides to genuinely * * * address various factors, these factors to change his behaviors, is of paramount importance related to this determination." *Id.* In addition, Dr. Davis stated that while Gregory had "a moderate degree of psychological factors for amenability, he could not "give an opinion within a reasonable degree of psychological certainty that [Gregory] is amenable due to the nature of the case and the nature of the research." *Id.* at p. 188.

{¶ 69} Even if Dr. Davis had been more positive, the juvenile court could give the weight it desired to the expert opinions and did not have to accept Dr. Davis's conclusions. A juvenile court has discretion "to assess the significance of the psychological evaluation's findings, including its weight and credibility, and then consider the totality of the circumstances presented in the case." *Davis*, 11th Dist. Lake No. 2002-L-127, 2003-Ohio-6741, at ¶ 31.

{¶ 70} We further stress the repeated recognition of Ohio courts " 'that "[t]he more serious the offense, the less amenable the juvenile will be to rehabilitation in the juvenile system." ' " *Howard*, 2d Dist. Montgomery No. 27198, 2018-Ohio-1863, at ¶ 33, quoting *State v. Johnson*, 2015-Ohio-96, 27 N.E.3d 9, ¶ 43 (8th Dist.). (Other citation omitted.) Notably, Gregory was convicted of a very serious offense. While the jury found Gregory had committed reckless homicide rather than murder, R.B. was not the only victim; three other individuals were also feloniously assaulted and harmed.

{¶ 71} Finally, as to Gregory's remorse, Dr. Fujimura stated that Gregory had not shown empathy for his own family, and that while Gregory said he was sorry for killing R.B., he did not accept responsibility – he only said that it was not supposed to happen. *Id.* at p. 92-83. Again, the juvenile court is the judge of credibility and chose to credit Dr. Fujimura's opinion.

{¶ 72} Based on the preceding discussion, we find no error in the juvenile court's decision to find that Gregory was not amenable to rehabilitation in the juvenile system and to remand the case to adult court. Accordingly, Gregory's Second Assignment of Error is overruled.

IV. Conclusion

{¶ 73} Both of Gregory's assignments of error having been overruled, the judgment is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Ben M. Swift
Hon. Mary E. Montgomery