[Cite as *State v. Peaks*, 2025-Ohio-2707.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30238 |
| Appellee | : | |
| | : | Trial Court Case No. 2022 CR 03480/2 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| TYLAN PEAKS | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on August 1, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
RONALD C. LEWIS, JUDGE

TUCKER, J., and HANSEMAN, J., concur.

**OPINION**
MONTGOMERY C.A. No. 30238


ROBERT ALAN BRENNER, Attorney for Appellant
MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee


LEWIS, J.

{¶ 1} Defendant-Appellant Tylan Peaks appeals from his convictions in the Montgomery County Court of Common Pleas, General Division, following his guilty pleas. Peaks argues that the trial court abused its discretion in granting the State's motions to transfer his cases from juvenile court to the general division for prosecution as an adult. For the following reasons, the judgment of the trial court will be affirmed.

### I.    Procedural History and Facts

{¶ 2} On January 27, 2022, a complaint was filed in the Montgomery County Court of Common Pleas, Juvenile Division, charging 15-year-old Peaks as a juvenile delinquent in Case No. 2022-000383 with one count of aggravated murder and three counts of aggravated robbery.   Each of the counts would have constituted felonies if committed by an adult.   The complaint was later amended to four counts of murder, three counts of aggravated robbery, two counts of felonious assault, and one count each of grand theft of a motor vehicle and tampering with evidence, all felonies if committed by an adult.   With the exception of grand theft of a motor vehicle and tampering with evidence, the counts included three-year firearm specifications.   The complaint was based on a carjacking of a Lyft driver at gunpoint in the early hours of January 26, 2022.   Less than an hour later, Peaks and his co-offenders shot and killed another Lyft driver during a second attempted carjacking.

{¶ 3} The State filed a motion for discretionary transfer under R.C. 2152.10(B) and

2152.12(B), asking the juvenile court to relinquish jurisdiction and transfer the case to the general division to try Peaks as an adult. On August 15, 2022, a probable cause hearing was held, after which the trial court found probable cause to believe that Peaks had committed each of the offenses alleged in the complaint. The matter was scheduled for a hearing to determine Peaks's amenability to treatment within the juvenile system.

{¶ 4} Prior to Peaks's amenability hearing, he was charged in a second complaint as a juvenile delinquent in the Montgomery County Court of Common Pleas, Juvenile Division, Case No. 2023-000124, for conduct that would amount to the following felonies if committed by an adult: three counts of aggravated robbery with attached three-year firearm specifications and three counts of grand theft of a motor vehicle. The State filed a motion to transfer the case to the general division for Peaks to be tried as an adult. The complaint was based on armed carjackings of an Uber driver and an Uber Eats driver on January 23, 2022, and of a Lyft driver on January 25, 2022, in the days leading up to the events alleged in Case No. 2022-000383.

{¶ 5} On April 3, 2023, a probable cause hearing was held in Case No. 2023-000124. Peaks stipulated to a set of facts and exhibits, which were submitted to the court. After reviewing the evidence, the trial court found probable cause to believe Peaks had committed the offenses charged in that case. An amenability hearing was scheduled for both of Peaks's cases.

{¶ 6} At the beginning of the amenability hearing, the parties agreed to submit the same exhibits that had been admitted during the two prior probable cause hearings, including the stipulated facts which were admitted as Court's exhibits. The State then presented the testimony of Dayton Police Detective Angela Woody and court psychologist Dr. Laura Fujimura.

{¶ 7} Detective Woody of the Dayton Police Department homicide unit testified that she was called out to 1029 Ferguson Avenue around 2:30 a.m. on January 26, 2022. A male, later identified as B.C., was discovered deceased in his crashed vehicle. B.C. was found in the driver's seat and had been shot and killed immediately prior to the crash. Detectives learned that his phone showed a notification indicating that he was on a Lyft job en route to 53 Cambridge Avenue when he crashed.

{¶ 8} Based on discussions with other detectives, a person of interest was known to live at 53 Cambridge Avenue. Just hours before B.C.'s shooting, an aggravated robbery of another Lyft driver, T.G., had occurred, and T.G. had also been en route to 53 Cambridge Avenue when she was carjacked. T.G.'s vehicle had a tracking system and was discovered inside a garage at 322 Anna Avenue.

{¶ 9} When officers went to 322 Anna Avenue on January 26, 2022, the residents, D.M. and his mother, came out of the house. Peaks and two others were found inside the residence. Peaks was transported to the police department for an interview with detectives. During his interview, Peaks made admissions about the robbery of T.G. and the homicide of B.C. After Detective Woody interviewed Peaks, other detectives also interviewed him about three additional robberies in which he was suspected of being involved. This included the robberies of Uber driver L.T. on January 23, 2022, Uber Eats driver J.S. on January 23, 2022, and Lyft driver C.B. on January 25, 2022. Peaks made admissions to the other detectives about his involvement in those three carjackings.

{¶ 10} A search of Peaks's social media accounts revealed information related to gang affiliations, guns, drugs, robberies, and stolen vehicles. One of the video clips from Peaks's social media account was a recording made approximately two hours before the robbery of T.G.; it showed Peaks with a firearm in a bedroom at 322 Anna Street. At the

end of the recording, a gunshot was fired inside the house.

{¶ 11} Dr. Laura Fujimura, a licensed psychologist employed at the Montgomery County Juvenile Court for more than 30 years, conducted a forensic assessment of Peaks for the amenability evaluation. She met with Peaks on three separate occasions, obtained a significant amount of collateral information, such as educational records, mental health records, medical records, and police reports, and spoke with Peaks's guardian, guardian ad litem, and probation officer. Dr. Fujimura utilized an instrument called the Structured Assessment of Violence Risk in Youth as a guide to categorize the data and assess factors and areas of risk.

{¶ 12} From the records Dr. Fujimura reviewed, she learned that Montgomery County Children Services ("MCCS") had obtained custody of Peaks in 2018. Peaks lacked family support; his mother was often on drugs, and he had a strained relationship with her after he was removed from the home. Although Peaks denied that he was ever physically or sexually abused, he witnessed domestic violence at home, and one of his mother's boyfriends called him names and threw things at him when he was about 10 years old. Peaks's two siblings were either in juvenile detention or prison, and his father had been in and out of prison for Peaks's whole life. His father also struggled with drugs in addition to mental disorders, such as bipolar disorder. Peaks stated he started smoking marijuana in 8th grade and drinking alcohol in 9th grade.

{¶ 13} MCCS was involved with Peaks's family for several years and primarily obtained placements for Peaks in foster homes or group homes and ensured that he was provided with services. Peaks exhibited a pattern of leaving placements and finding different places to stay. As the runaway behaviors and oppositional behaviors continued, there were fewer placements willing to take him. In January 2022, Peaks was placed with

a non-relative friend of the family, although at the time of the offenses at issue, he was staying at a friend's home. It was difficult for services to be provided to Peaks, because he refused to remain in locations where individuals could support him.

{¶ 14} Although Peaks did not perform at an appropriate grade level in all his subjects, Dr. Fujimura believed it was because he missed a lot of school, not because he had an intellectual disability. Peaks's absences became so chronic that he essentially quit attending school. But while in the detention center, Peaks had a GPA of 3.4 and informed Dr. Fujimura that he wanted to graduate high school, attend college, and own his own shoe business online.

{¶ 15} Peaks had a long-standing history of behavioral difficulties in school beginning in the second grade. At the age of eight, Peaks exhibited issues such as cursing, throwing desks, making inappropriate sexual gestures, and intimidating other students to the point that they were fearful of Peaks due to his emotional outbursts and inability to control his anger. Peaks had a history of suspensions for fighting, including one suspension for threatening to shoot up the school when he became angry, which led to formal delinquency charges. Because of his behavioral issues, Peaks was linked with mental health services through South Community, where he engaged in individual therapy, family therapy, psychiatric services, and equine therapy. His family was provided with transportation and food assistance.

{¶ 16} Peaks received services through South Community beginning in 2015. There was subsequently a pause in services, but they were re-initiated in August 2017. As of December 28, 2020, Peaks no longer received services through South Community because he did not want to engage in treatment and would not speak with his therapist.

{¶ 17} In 2019, Peaks was adjudicated for making false alarms related to his threat

to shoot up the school. He was placed on probation and linked to many services. Peaks was connected with a basketball team and yoga classes, received a mentor, and worked with Sunlight Village, where he could mow lawns for money. Peaks's probation officer worked to continue the services for Peaks for a year after his probation ended. Peaks told his probation officer that "he will do what he wants and does not care about what he is being told to do." Tr. 81.[1] Peaks told Dr. Fujimura that he learned nothing from being on probation.

{¶ 18} Peaks was diagnosed with attention deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder as a child. Peaks was later diagnosed with post-traumatic stress disorder ("PTSD"), ADHD, and conduct disorder with childhood onset, meaning that his symptoms occurred prior to age 10. Dr. Fujimura stated that conduct disorder with childhood onset was more difficult to treat than if the onset had been at a later age, and the symptoms did not remain as long.

{¶ 19} According to Dr. Fujimura, as a pattern, there had been no decrease in Peaks's behaviors from age 8 to 15. Rather, they remained stable or increased and then escalated dramatically prior to his detention. By February 2023, however, Peaks had a black shirt in the detention center, which designated the best behavior level. Despite this, Dr. Fujimura suspected that Peaks was not genuinely motivated to do better and attributed his improvement to not wanting to get bound over to the adult court.

{¶ 20} While at the detention center, Peaks participated in individual counseling with Ashley Hall for 30 sessions and then with Erika Jones for 6 sessions. At the time of the amenability hearing, he was seeing Jones, who indicated that Peaks had been distancing

---

[1] All references to transcripts in this opinion are to the amenability hearing.

himself and not requesting as many sessions with her. Jones further stated that Peaks was not talking and engaging as fully as he could during his sessions with her. Peaks had made suicidal comments, but he told Dr. Fujimura that he would do that when he was angry. In discussing a time when Peaks made a threat to harm himself, Dr. Fujimura explained that it was done in a way to manipulate others. Thus, it was a behavioral issue for Peaks, not a mental health issue.

{¶ 21} Dr. Fujimura opined that Peaks had a high risk of engaging in future violent behavior and was not amenable to services in the juvenile justice system. Peaks lacked positive support and other factors that could mitigate his risk. Dr. Fujimura stated that Peaks would need extremely intense and longer-term treatment, which would be problematic if he was not motivated to participate in the treatment. In the past, Peaks had not cooperated and had not been willing to acknowledge his issues, which Dr. Fujimura explained would make successful treatment extremely difficult. According to Dr. Fujimura, the problem was not that services were unavailable to Peaks, but whether he would be receptive or willing to participate in that treatment. Despite all the services he had received over the years, Peaks's behavior escalated in frequency and severity.

{¶ 22} According to Dr. Fujimura, Peaks wanted to gratify his own needs, regardless of the impact on other people. The proximity of Peaks to the victims of his offenses rose to a level of a blatant willingness to transgress social norms and disregard the rights of others. Although Dr. Fujimura believed there were programs that could address some of Peaks's issues, he would have to be receptive to those services. However, he had demonstrated that in spite of all the services provided to him, he had not improved much.

{¶ 23} While Dr. Fujimura acknowledged that Peaks stated he felt disappointed and that he had let his family down by getting criminal charges, she noted that Peaks tended to

talk about how it affected him rather than the victims. She perceived that Peaks's behaviors were not consistent with someone who was genuinely remorseful and wanted to make things better. Dr. Fujimura explained that whenever Peaks was presented with the proverbial fork in the road, he seemed to go in the negative direction.

{¶ 24} Following the State's presentation of evidence, forensic psychologist Dr. Barbara Bergman testified for the defense. Dr. Bergman was retired and in private practice. She had previously worked at Summit Behavioral Healthcare in the restoration to competency unit for adult males. Dr. Bergman had evaluated Peaks during a 2½ hour interview. She conducted both a risk assessment and mental evaluation. Dr. Bergman used the Risk-Sophistication-Treatment-Interview ("RSTI") format to evaluate Peaks, which consisted of a booklet of questions. In doing her evaluation, she did not take into account the two aggravated robberies that occurred on January 23, 2022, or the aggravated robbery from January 25, 2022. She did not speak with the guardian ad litem, any parent or guardian of Peaks, his probation officer, or his most recent psychologist, Jones. While Dr. Bergman considered Peaks's history of treatment with South Community, she did not take into account that he started treatment in early 2015.

{¶ 25} Dr. Bergman saw evidence of conduct disorder and cannabis abuse, but she did not see evidence of ADHD or PTSD. Dr. Bergman stated Peaks's conduct disorder was adolescent onset, even though there was evidence of conduct disorder before the age of 10. Dr. Bergman acknowledged that the Diagnostic and Statistical Manual of Mental Disorders ("DSM") recognized the diagnosis of childhood onset if symptoms appeared before the age of 10, but Dr. Bergman stated that she would not diagnose anyone with conduct disorder at 8 years old. Dr. Bergman further acknowledged that the DSM recognized that if there was a diagnosis of conduct disorder, childhood onset, there was a

greater likelihood that the behavior would continue into adulthood.

{¶ 26} Dr. Bergman determined that Peaks was of average intelligence and had not been working up to his capacity or grade level before being committed to the juvenile detention center. Since being detained, Peaks had improved academically, but Dr. Bergman also assumed that was because he had no choice but to attend school while in detention. Dr. Bergman did not see improvement otherwise, as Peaks was still getting into fights, cursing, and breaking the rules.

{¶ 27} Dr. Bergman testified that Peaks's family was "disorganized," with his mother living in a nursing home and his father and older brother in prison. Peaks had been placed in foster care and a group home growing up and with an aunt as his guardian prior to his detention. Although Peaks's aunt was a "pro-social" person, there were a lot of kids in the house, and Peaks did not get the supervision and structure he needed. Peaks had informed Dr. Bergman that he had many friends when he was younger and did not get into trouble with them, but that as he reached adolescence, he developed social relationships with kids who acted out.

{¶ 28} According to Dr. Bergman, Peaks had no significant violent history prior to the events of January 26, 2022, and Peaks did not perceive his behavior as escalating. Peaks told her that he was sad he had caused fear and damage because of his violent behavior. He also was sorry that he had let his family down. Peaks was able to verbalize responsibility for bad behaviors and took full responsibility for what he did. Dr. Bergman felt that Peaks was being genuine and honest.

{¶ 29} Dr. Bergman stated that Peaks was very impulsive and did not consider consequences before acting. She also stated that Peaks had great difficulty controlling his anger and keeping his behavior within appropriate limits. Although Peaks had received

treatment previously, he had not received enough treatment and may not have been engaging in the treatment.

{¶ 30} Dr. Bergman identified a few typos in her report, including an error in the sophistication and maturity section where she rated Peaks's cognitive capacity at a six; she testified it should have been a five, but that change did not affect Peaks's cognitive capacity, which was in the middle range. Dr. Bergman also testified that under the emotional maturity section, the rating in her report was two, which she testified should have been one. The changes resulted in Peaks's sophistication and maturity level being reduced from middle or moderate to a low range compared to other juveniles.

{¶ 31} Dr. Bergman testified that Peaks was in the middle range for the risk of dangerousness. She explained that Peaks scored high in violent and aggressive tendencies, while his extensive criminality and psychopathic features were in the middle range. Peaks ranked high for antisocial behavior, unprovoked violent behavior, and premeditated crimes. The total scores indicated a "middle, moderate" amenability to treatment. In her opinion, Peaks was amenable to treatment in the juvenile system and five years would be enough time at the Ohio Department of Youth Services to make significant progress.

{¶ 32} On September 6, 2023, the trial court granted the State's motions to transfer jurisdiction of Peaks's cases to the general division of the Montgomery County Court of Common Pleas for criminal prosecution as an adult. The court found that Peaks was not amenable to care or rehabilitation within the juvenile system in either of his cases and that the safety of the community required that Peaks be subject to adult sanctions.

{¶ 33} On September 20, 2023, a Montgomery County grand jury indicted Peaks on four counts of murder, in violation of R.C. 2903.02(B), unclassified felonies; six counts of

aggravated robbery, in violation of R.C. 2911.01(A)(1), felonies of the first degree; one count of felonious assault, in violation of R.C. 2903.11(A)(1), a felony of the second degree; one count of felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree; one count of tampering with evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree; and four counts of grand theft of a motor vehicle, in violation of R.C. 2913.02(A)(1), felonies of the fourth degree.   Except for grand theft of a motor vehicle and tampering with evidence, all of the counts had three-year firearm specifications attached.

{¶ 34} On July 9, 2024, Peaks entered a guilty plea as charged with no agreement on sentencing.   The trial court found him guilty and ordered a presentence investigation report.   At sentencing, the trial court merged each grand theft offense with the corresponding aggravated robbery count, merged the felonious assaults into the corresponding murder counts, and merged the murder charges into a single murder count. The trial court then imposed an indefinite sentence of 6 to 9 years in prison for each aggravated robbery, with a three-year firearm specification on each, but all the aggravated robbery counts and those firearm specifications were ordered to run concurrently with each other and concurrently with a 3-year prison term for tampering with evidence.   The court imposed an indefinite prison term of 15 years to life on the murder, to run consecutively to all the other charges and specifications. The 3-year firearm specification on the murder charge was likewise ordered to be served consecutively to all other charges and specifications.   Thus, the aggregate sentence was 27 years to life in prison.

{¶ 35} Peaks timely appealed.

## II.    Amenability

{¶ 36} Parks raises the following assignment of error:

THE JUVENILE COURT ABUSED ITS DISCRETION WHEN IT BOUND

PEAKS OVER TO THE COMMON PLEAS COURT FOR PROSECUTION.

**{¶ 37}** A juvenile court's amenability determination is reviewed under an abuse-of-discretion standard. *State v. Howard*, 2018-Ohio-1863, ¶ 14 (2d Dist.), citing *In re M.P.*, 2010-Ohio-599, ¶ 14, and *State v. Watson*, 47 Ohio St.3d 93, 95 (1989). An abuse of discretion is "an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc.* v. *River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985).

**{¶ 38}** "Juvenile courts possess exclusive jurisdiction over children alleged to be delinquent for committing acts that would constitute a crime if committed by an adult." *In re M.P.* at ¶ 11, citing R.C. 2151.23(A). "Under specified circumstances, however, a juvenile may be subject to a mandatory or discretionary transfer, also referred to as a 'bindover procedure,' from the juvenile court setting to adult court for criminal prosecution." *State v. Walker*, 2024-Ohio-729, ¶ 18 (8th Dist.). "Whether an alleged offender is subject to mandatory or discretionary transfer depends on such factors as the nature of the offense, the age of the child, and the child's prior criminal history, if any." *Steele v. Harris*, 2020-Ohio-5480, ¶ 10.

**{¶ 39}** If a child was 14 years of age or older at the time of the alleged act and the act alleged would constitute a felony if committed by an adult, the juvenile court may transfer its jurisdiction to the appropriate adult court for criminal prosecution so long as certain criteria are met. R.C. 2152.12(B). In order to grant a discretionary transfer, the juvenile court must first find: (1) the child was 14 years of age or older at the time of the act charged; (2) there is probable cause to believe that the child committed the act charged; and (3) the child "is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions." R.C. 2152.12(B)(1)-

(3).

{¶ 40} In this case, there is no dispute that Peaks satisfied the age and probable cause requirements set forth in R.C. 2152.12(B)(1) and (2). The only issue is whether the trial court abused its discretion in determining that Peaks was not amenable to care or rehabilitation within the juvenile justice system.

{¶ 41} "Before ordering a discretionary transfer, the juvenile court must conduct an amenability hearing." *Steele*, 2020-Ohio-5480, at ¶ 11, citing *State v. D.W.*, 2012-Ohio-4544, ¶ 10-12; R.C. 2152.12(B). "An amenability hearing helps determine whether a juvenile who is eligible for discretionary bindover will be transferred to adult court." *D.W.* at ¶ 12. Prior to the hearing, the juvenile court must order an "investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child by a public or private agency or a person qualified to make the examination." R.C. 2152.12(C). *See also* Juv.R. 30(C). In making the amenability determination under R.C. 2152.12(B), the juvenile court must weigh the statutory factors in R.C. 2152.12(D) in favor of transfer against the statutory factors in R.C. 2152.12(E) against transfer. *State v. Nicholas*, 2022-Ohio-4276, ¶ 5. In addition, the court must indicate on the record the specific factors it weighed in making its determination. *Id.*, citing R.C. 2152.12(B)(3).

{¶ 42} "Because the statutory scheme does not dictate how much weight should be given to any specific factor, the ultimate decision rests in the discretion of the juvenile court." *State v. Bryant*, 2024-Ohio-1192, ¶ 16 (2d Dist.). "[A] juvenile court's decision to exercise its discretion to transfer a juvenile to adult court must be supported by a preponderance of the evidence." *Nicholas* at ¶ 35. "[A] preponderance of evidence means the greater weight of evidence." *Travelers' Ins. Co. of Hartford, Connecticut v. Gath*, 118 Ohio St. 257,

261 (1928). " 'The greater weight may be infinitesimal, and it is only necessary that it be sufficient to destroy the equilibrium.' " *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987), quoting *Gath* at 261.

{¶ 43} Pursuant to R.C. 2152.12(D), in addition to any other relevant factors, the trial court must consider the following factors that weigh in favor of transferring the case to the general division of the common pleas court:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

{¶ 44} Pursuant to R.C. 2152.12(E), in addition to any other relevant factors, the trial court must consider the following factors that weigh against transferring the case to the general division of the common pleas court:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

{¶ 45} Peaks argues that Dr. Bergman believed he was amenable to rehabilitation in the juvenile system, and therefore the trial court should have found that he was amenable

and denied the State's motions to transfer him. He highlights that his diagnoses were all treatable, and he was willing to engage in treatment, expressed educational goals and a desire to start his own business, showed improvement while in juvenile detention, and expressed remorse about the harm to the victims.

{¶ 46} Having thoroughly reviewed the record, we cannot conclude that the trial court abused its discretion in finding Peaks was not amenable to care and rehabilitation in the juvenile justice system or in transferring jurisdiction. The court considered and weighed the appropriate statutory factors listed in R.C. 2152.12(D) and (E), and the record supported the court's findings.

{¶ 47} Following the amenability hearing, the trial court found that Peaks was not amenable to care or rehabilitation in the juvenile justice system and that the safety of the community required that Peaks be subject to adult sanctions. Therefore, the trial court granted the State's motions to transfer Peaks's cases to the adult court. In finding that Peaks was not amenable, the court found several factors that weighed in favor of transfer and no factors that weighed against transfer. Specifically, the court found that R.C. 2152.12(D) factors (1), (4), (5), (7), (8), and (9) favored transfer.

{¶ 48} Under R.C. 2152.12(D)(1), the juvenile court found that several victims suffered physical or psychological harm or serious economic harm as a result of the alleged acts. This finding was supported by the record: four of the drivers had been threatened and robbed at gunpoint of various personal possessions, and they all had their vehicles stolen. All the victims had used their vehicles for employment purposes and were affected by the thefts of their vehicles. In particular, B.C. was shot and killed in an attempted robbery of his vehicle and ultimately crashed it after being shot.

{¶ 49} Under R.C. 2152.12(D)(4), the juvenile court noted that Peaks had allegedly

committed the acts charged for hire or as a part of a gang or other organized criminal activity. The record reflects that Peaks was known to associate with members of a gang known as the "Hot Boys" or "Upway," which had a history of engaging in criminal activity. Peaks told Dr. Fujimura that he and his co-offenders had formed the "Upway" gang, but then he described it as a "little clique" rather than a gang. State's Ex. 15, p. 4.[2] Detective Woody discussed her familiarity with the "Hot Boys" or "Upway" gang at the amenability hearing, and she identified the founding member, who had had multiple communications with Peaks. Peaks referred to himself as a "hot boy," and one of his social media subscriber names was "upwaytylan." During the course of his January crime spree, Peaks repeatedly had discussions with his co-offenders and other members of the gang about stealing cars, committing thefts, and obtaining guns, ammunition, and drugs. The attacks were planned and organized among the co-offenders, sometimes with the offenders agreeing to split the profits of the robberies among themselves. Unlike the other co-offenders, Peaks personally participated in all five of the armed robberies. Although Peaks denied being a member of a gang, he made statements that he liked the "sense of family" that gangs provided him, and he was reprimanded in the detention facility for making hand gestures and signs classified as gang signs. Court Investigation Report, p. 1-2.

{¶ 50} Under R.C. 2152.12(D)(5), the juvenile court found that Peaks had a firearm on or about his person or under his control at the time of the act charged and allegedly used or displayed the firearm, brandished the firearm, or indicated that he possessed a firearm. All the victims were robbed at gunpoint, and B.C. was killed by gunfire. Based on co-offender D.P.'s testimony, Peaks was in possession of and brandished a firearm during the

---

[2] The State's exhibits at the amenability hearing were duplicated and submitted in each of the two cases. This opinion cites the exhibits as numbered in Case No. 2023-000124.

three robberies in which D.P. was involved.   Court's Exhibit 1, Stipulation 10.   The records from Peaks's social media accounts and Detective Woody's testimony further reflected that during the relevant time frame, Peaks was in possession of a firearm, requested ammunition from other sources, and posted videos of himself in possession of a firearm.   One video, taken less than two hours before the robbery of T.G. and three hours before the robbery-murder of B.C., recorded Peaks and his cohorts in a bedroom at 322 Anna Street with multiple guns, one of which was fired off inside the house.   The video showed Peaks and another co-offender displaying handguns.   During the carjacking of T.G., two of the juveniles brandished firearms.   After B.C. was killed by multiple gun shots, Peaks and the other three individuals involved in the robberies were discovered at 322 Anna Street.   The gun that was later determined to have killed B.C. was recovered from 322 Anna Street during the execution of a search warrant.

{¶ 51} Under R.C. 2152.12(D)(7), the juvenile court found that the results of previous juvenile sanctions and programs indicated that Peaks could not be rehabilitated in the juvenile system.   Peaks first became involved in the juvenile court system in 2017 at the age of 10, and he participated in the 10 and Under program through the juvenile court at that time.   In 2019, Peaks was adjudicated delinquent for making false alarms when he threatened to shoot up his school.   Peaks was placed on probation and linked with multiple services, which the probation officer was able to continue for a year beyond the completion of Peaks's probationary period.   Peaks also was charged with being unruly in 2019 and with aggravated trespassing in January 2022, just days before the offenses in this case were committed.   Peaks informed Dr. Fujimura that he had learned nothing from being on probation.   Peaks also told his probation officer that "he will do what he wants and does not care about what he is being told to do."   Tr. 81.

{¶ 52} In addition to probation, Peaks had received various services and counseling since the age of eight. Peaks continued to receive treatment and counseling while at the detention facility. Nevertheless, both doctors opined that Peaks had not made much improvement over the years. In detention, Peaks had received numerous disciplinary reports and was noted to be a "ring leader that stirs up conflict."

{¶ 53} Under R.C. 2152.12(D)(8), the juvenile court found that Peaks was emotionally, physically, and psychologically mature enough for the transfer. Peaks was described as tall and appeared his age. Both Drs. Bergman and Fujimura agreed that Peaks was of average intelligence and did not have any intellectual disabilities. Rather, Peaks's poor performance in school was the result of a lack of attendance and behavioral issues, as evidenced by his ability to obtain As and Bs while in the detention facility. According to Dr. Bergman, Peaks understood the difference between right and wrong. Peaks was able to identify negative effects of his behavior on family, the victims, and the community. Counselor Hall noted that Peaks "was able to identify what makes him angry and to talk about his behavioral responses." State's Ex. 15, p 6.

{¶ 54} Under R.C. 2152.12(D)(9), the juvenile court found that there was not sufficient time to rehabilitate Peaks within the juvenile system. At the time of the amenability hearing, Peaks was approximately 16½ years old. Because Peaks could only remain in the juvenile system until his 21st birthday, the court would have had approximately 4½ years to rehabilitate him. The trial court found that this was not sufficient time to rehabilitate Peaks within the juvenile system.

{¶ 55} Although Dr. Bergman ultimately concluded that Peaks was amenable to care or rehabilitation in the juvenile system, the trial court was not required to agree with her conclusion and reasonably credited Dr. Fujimura's opinion over Dr. Bergman's. "[T]he

juvenile court was free to assign any weight to the psychologist's opinion that the court deemed appropriate." *State v. Davis*, 2010-Ohio-3782, ¶ 21 (4th Dist.). Notably, although Dr. Bergman concluded that Peaks was amenable to rehabilitation in the juvenile system, her testimony regarding Peaks was not favorable.

{¶ 56} Dr. Bergman testified that Peaks had been diagnosed with conduct disorder, cannabis abuse, PTSD, and ADHD. Although Dr. Bergman readily agreed with the diagnoses for conduct disorder and cannabis abuse, she observed no behaviors related to PTSD or ADHD. Even so, all of Peaks's diagnoses were generally considered treatable by both Drs. Bergman and Fujimura. The fact that Peaks had already been in treatment for several years and had not improved was significant. One of the factors upon which Dr. Bergman relied in concluding that Peaks was amenable to rehabilitation in the juvenile system was that she found Peaks's criminally delinquent behaviors had begun during early adolescence. Dr. Bergman acknowledged during cross-examination that the DSM recognized a diagnosis of conduct disorder, childhood onset as being an onset of symptoms prior to age 10. Although Dr. Bergman was aware that Hall stated Peaks met the criteria for conduct disorder with childhood onset, and Dr. Bergman agreed that Peaks's symptoms of conduct disorder were documented as early as the age of 8, Dr. Bergman stated that she would not diagnose anyone with conduct disorder at that age. Nevertheless, both Drs. Bergman and Fujimura acknowledged that early onset conduct disorder (before the age of 10) was more difficult to treat than if it were developed later in life, and there was a greater likelihood of the behavior continuing into adulthood. Dr. Fujimura explained that the earlier the symptoms appeared and the longer the symptoms occurred, the more difficult such a disorder would be to treat because of its ingrained nature. Dr. Fujimura opined that Peaks's "long-standing history of an unabashed endorsement of criminally-minded thinking seems

to be deeply engrained and highly resistant to treatment intervention." State's Ex. 15, p. 17.

{¶ 57} Drs. Bergman and Fujimura agreed that Peaks had improved academically since he had been in detention, but they also agreed that Peaks had not made much progress otherwise during that time. Dr. Bergman testified that other than Peaks's academics, she had not seen improvement, considering that Peaks was still fighting, cursing, and breaking rules. While in detention, Peaks had threatened a staff member that he would catch her leaving work and "smoke her ass and [another youth] like he did the Uber driver." State's Ex. 15, p. 9. He also threatened to kill staff and others on multiple occasions.

{¶ 58} Dr. Bergman testified that Peaks said he was sad that he had caused damage and fear because of his violent behavior. He stated he was sorry that he let his family down and that he was locked up. Dr. Bergman found that Peaks was able to verbalize responsibility for bad behaviors and took full responsibility for what he did. Although Dr. Bergman believed Peaks was genuine and honest, Dr. Fujimura did not. Rather, Dr. Fujimura believed Peaks did not demonstrate genuine remorse and was instead trying to look good to get what he wanted. Dr. Fujimura stated that Peaks tended to deny or minimize problematic issues, to focus on how his actions affected him rather than the victims, and to demonstrate manipulative behaviors.

{¶ 59} Dr. Bergman classified Peaks as "middle moderate amenability to treatment." According to Bergman, because Peaks scored in the middle, it "could go either way," but she ultimately concluded that Peaks was amenable. Although Dr. Bergman believed that, during the year and a half that Peaks had received mental health treatment while in detention, he had not made great progress, she also believed that 4½ years would be

"enough time to make significant progress *if* [Peaks] engages." (Emphasis added.) Tr. 179. She scored Peaks high for having violent and aggressive tendencies and in the middle range for planned and extensive criminality and psychopathic features. She noted that Peaks had great difficulty controlling his anger and keeping his behavior within appropriate limits. She testified that Peaks was very impulsive and did not think about consequences before acting. In forming her opinion that Peaks was amenable to care or rehabilitation within the juvenile system, she had been unaware of the two aggravated robberies that occurred on January 23, 2022, and the aggravated robbery on January 25, 2022. Dr. Bergman did not speak with the guardian ad litem, any parent or guardian of Peaks, Peaks's probation officer, or his most recent psychologist, Jones. While Dr. Bergman considered Peaks's history of treatment with South Community, she did not take into account that he had started treatment in 2015, with his initial diagnostic assessment on January 27, 2015.

{¶ 60} Dr. Fujimura, on the other hand, opined that Peaks would need extremely intense and long-term treatment, which would be problematic if he were not motivated to participate in the treatment. In her opinion, Peaks had demonstrated that he would not cooperate with treatment, and he had not been willing to acknowledge his issues, which would make treatment extremely difficult. As Dr. Fujimura stated in her updated report, Peaks had "developed a highly consistent pattern of engaging in antisocial, aggressive, manipulative, bullying, threatening, and defiant behaviors." State's Ex. 19, p. 14. "The escalation in frequency and intensity of dangerousness associated with many of [Peaks's] choices has shown blatant resistance to genuine improvement in pro-social actions in spite of long-standing, intensive, collaborative intervention." *Id*.

{¶ 61} The record reflects that the juvenile court carefully considered the R.C. 2152.12(D) and (E) factors weighing for and against transferring Peaks's cases to the

general division for adult prosecution. The record supports the juvenile court's conclusions regarding the relevant R.C. 2152.12(D) and (E) factors and the court's ultimate conclusion to transfer Peaks's cases to the general division for adult prosecution. We cannot conclude that the juvenile court abused its discretion by ordering the bindover of Peaks's cases. Peaks's assignment of error is overruled.

### III. Conclusion

{¶ 62} Having overruled Peaks's assignment of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .

TUCKER, J. and HANSEMAN, J., concur.