[Cite as *State v. Roberts*, 2026-Ohio-1790.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-44 |
| Appellee | : | |
| | : | Trial Court Case No. 25-CR-0186 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| JEREMIAH ROBERTS | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on May 15, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

LEWIS, P.J., and TUCKER, J., concur.

VICTORIA FERRY, Attorney for Appellant
JOHN M. LINTZ, Attorney for Appellee

HANSEMAN, J.

**{¶ 1}** Defendant-Appellant Jeremiah Roberts appeals from his attempted murder conviction in the Clark County Common Pleas Court, General Division, following a guilty plea. Roberts claims that the juvenile court abused its discretion when it transferred his case from juvenile court to the common pleas court for prosecution as an adult. Specifically, Roberts argues the juvenile court erred in determining that he was not amenable for rehabilitation within the juvenile system. For the following reasons, the judgment is affirmed.

## I. Facts and Course of Proceedings

**{¶ 2}** On October 9, 2024, a complaint was filed in the Clark County Common Pleas Court, Juvenile Division, charging 15-year-old Roberts as a juvenile delinquent with the offenses of attempted aggravated murder, felonious assault, tampering with evidence, and carrying a concealed weapon. A gun specification was attached to each charge. The charges were based on a shooting that occurred during the early morning hours of October 4, 2024, at Cole Manor Apartments in Springfield, Ohio.

**{¶ 3}** On October 16, 2024, the State filed a motion for discretionary transfer under R.C. 2152.10(B) and Juv.R. 30, which asked the court to relinquish jurisdiction and transfer the case to the common pleas court to try Roberts as an adult. A probable cause hearing followed on November 15, 2024.

**{¶ 4}** At the probable cause hearing, the victim testified that while attending a birthday party at Cole Manor Apartments, a verbal disagreement ensued with a female. The female

called her cousin, who threatened to arrive at the apartments with acquaintances to shoot the victim. Later that evening, the victim was outside of the apartments, and the victim was approached by a female, who was the cousin, and a male holding a firearm. The victim saw Roberts leaning up against a vehicle farther away from the female and male holding a firearm. The male asked some questions, and then he shot the victim. Once the victim was shot, the victim turned and began running away. However, the victim was shot and struck between eight to ten times. After all shots were fired, the male, female, and Roberts all fled the apartments together in a vehicle.

{¶ 5} On November 20, 2024, the juvenile court found probable cause to believe that Roberts committed the offenses of attempted aggravated murder, felonious assault, and tampering with evidence.[1] In its decision, the court ordered an investigation of Roberts' social history, education, family situation, along with any other information bearing on his amenability to juvenile rehabilitation. A mental examination was also ordered to be completed by Dr. Daniel D. Hrinko, Psy.D. In addition, the court appointed a guardian ad litem ("GAL"). An amenability hearing was scheduled for February 6, 2025.

{¶ 6} Prior to the hearing, Dr. Hrinko provided a written report concluding that Roberts was amenable to the juvenile system. The State filed a motion for a second evaluation. The court overruled the motion stating further evaluation was unnecessary. The amenability hearing went forward as scheduled with the State calling two witnesses, Dr. Hrinko and Roberts' probation officer ("PO").

{¶ 7} Roberts' PO testified that he had been supervising Roberts since August 2023, after Roberts was adjudicated delinquent for the offense of theft of a firearm. Roberts was on intensive supervision, during which he largely failed to attend school or mental health

---

1. The carrying concealed weapon offense was dismissed.

treatment and associated with other youth who had active warrants. A few months into Roberts' supervision, he stopped reporting to his PO as well, and a warrant was issued. Roberts was arrested on his warrant, at which time he was with other youth and in possession of at least five firearms. Efforts at house arrest failed with Roberts. After Roberts was arrested in October 2024 for the instant case, he resided in the juvenile detention center, where he engaged in mental health treatment, participated in groups, and behaved in a positive way without incident.

{¶ 8} Dr. Hrinko testified about the contents of his written report. Regarding Roberts' social history and family, Roberts' father was absent, and he had been living with his Mother, to whom he did not listen or obey. Roberts also has four siblings, and a young child himself. Roberts reported to Dr. Hrinko that he associated with friends who were older than he who were affiliated with gangs, drugs, and guns. Roberts also reported that he ran "the streets" with his friends, skipped school, and allowed his friends to store their guns in his home. Roberts reported having an affinity for guns, getting in trouble for stealing a gun, and accidentally shooting himself in the leg with a gun.

{¶ 9} Roberts did not have any significant mental health issues. It was reported to Dr. Hrinko that Roberts may have Attention Deficit Hyperactivity Disorder and anger issues. Drug abuse and alcohol use were also present in Roberts' history, specifically marijuana and ecstasy. Dr. Hrinko's impression was that Roberts had limited insight into his own choices and as a result, appeared immature, childish, and impulsive.

{¶ 10} On the psychological assessment of the Jessness Inventory, an assessment designed to compare the responses of Roberts with responses of individuals in normal as well as criminally involved adolescents, Dr. Hrinko explained that Roberts' responses showed he was distorting his answers, which indicated that he was not being honest. Dr.

4

Hrinko explained that the assessment was statistically likely to provide a valid result, and he opined that Roberts' overall profile showed no evidence of a significant commitment to a criminal lifestyle or embracing criminological values. Dr. Hrinko testified that the assessment did not indicate that Roberts would embrace the attitudes and values of deviant offenders. In addition, Dr. Hrinko said there were indications that Roberts was likely to rely on others for direction, support, and guidance and that he viewed his peers in an idealized and positive way, while overlooking their faults and conflicts.

{¶ 11} Dr. Hrinko also administered a structured assessment of violence risk for youth ("SAVRY") on Roberts. This test was done to guide Dr. Hrinko's opinion on Roberts' level of risk to the community. In the category of historical risk factors, Roberts was deemed to be high risk in four of ten factors. In the area of social contextual factors, Roberts scored a high level due to meeting five of six factors. In the category of individual clinical risk factors, Dr. Hrinko scored Roberts at a high level on four of eight factors, including poor decision making, substance abuse, poor compliance on supervision and in school, and low interest or commitment to supervision and school. The other four factors included in this test were scored at a moderate range based on Roberts embracing some attitudes consistent with crime and violence, having difficulty controlling expressions of anger, showing an impairment in age-appropriate capacity for experiencing remorse and empathy, and having difficulties with restlessness or hyperactivity. Dr. Hrinko's overall opinion was that Roberts posed a moderate- to high-level risk of violence to the community. However, Dr. Hrinko admitted at the hearing that if he factored in Roberts' possession of a weapon at the time of the offense, including Roberts shooting the firearm, he would rate Roberts' risk at a higher level. Ultimately, Dr. Hrinko's report discloses that the SAVRY assessment is not necessarily

mathematically reliable or valid given the lack of research studies, statistical analysis, or normative samples.

{¶ 12} Although Dr. Hrinko's report did not go into detail regarding Roberts' level of emotional and psychological maturity for the transfer, the juvenile court asked Dr. Hrinko for his opinion at the hearing. Dr. Hrinko testified that he had "doubts" due to Roberts' level of psychological functioning, and he stated that Roberts functioned at a 13- or 14-year-old level when it involved his judgment, decision-making, and impulse control.

{¶ 13} Though Roberts did not comply with terms and conditions of his supervision while on probation, following his arrest after the October 2024 shooting, Roberts engaged and participated in services offered at the juvenile detention center. Dr. Hrinko verified that Roberts was participating in group counseling focused on social pressures, drug use, strategies for exercising good judgment, avoiding influences of negative individuals, and skill building for parental responsibilities. Based on all the information Dr. Hrinko reviewed and obtained regarding Roberts, he opined that Roberts was amenable to the juvenile justice system. Dr. Hrinko believed that a structured environment with intensive treatment in a "24-7" secured and controlled facility would address Roberts' needs, rehabilitate him, and protect the public from further harm.

{¶ 14} Though the GAL attended the hearing, she did not testify. However, at the end of the hearing, the GAL provided an oral recommendation that it was in Roberts' best interest to remain in the juvenile court system.

{¶ 15} On February 24, 2025, the juvenile court filed a written decision granting the State's motion to relinquish jurisdiction. The court's decision detailed all the statutory factors that weighed in favor of relinquishing jurisdiction, as well as all statutory factors that weighed against the transfer to the general division. The juvenile court included the relevant factors

6

it considered in favor of the transfer as 1, 5, 6, and 7 and the relevant factors against transfer as 6 and 8. The court noted the GAL's and Dr. Hrinko's opinions in favor of Roberts' amenability to remaining in the juvenile justice system, but the court disagreed with their recommendations and stated:

> THE COURT FURTHER FINDS that the Court has carefully weighed the factors in favor and against transfer to the adult division. The Court has weighed the immaturity of the youth and ability of the juvenile justice to address the youth's history of violence against the failure of the previous intensive juvenile justice interventions and continued alleged violence committed by the youth. The Court is not convinced that there is sufficient time to rehabilitate the youth with the current resources available in the juvenile justice system, including a commitment to the Ohio Department of Youth Services, without compromising a degree of public safety.

Judgment Entry (Feb. 24, 2025).

{¶ 16} On March 11, 2025, Roberts was indicted for attempted murder, two counts of felonious assault, and tampering with evidence. Firearm specifications were attached to three of the counts. On June 3, 2025, Roberts pleaded guilty to attempted murder, a felony of the first degree, with the State dismissing the remaining counts and specifications. Roberts was sentenced to an agreed indefinite prison term of 10 to 15 years. This appeal followed.

**II. Assignment of Error**

{¶ 17} Roberts raises one assignment of error:

The trial court abused its discretion when it transferred Jeremiah's case for criminal prosecution, in violation of R.C. 2152.12(B); U.S. Const., amend V

7

and XIV; and Ohio Const., art. I, § 10.

{¶ 18} His issue presented for review asks:

Was it unreasonable for the juvenile court to transfer Roberts' case for prosecution as an adult when the safety of the community could be adequately protected, there was an appropriate time and resources in the juvenile system, and Roberts was amenable to treatment?

**III. Discretionary Transfer Under R.C. 2152.12(B)**

{¶ 19} "Juvenile courts possess exclusive jurisdiction over children alleged to be delinquent for committing acts that would constitute a crime if committed by an adult." *In re M.P.*, 2010-Ohio-599, ¶ 11, citing R.C. 2151.23(A). However, when a complaint has been filed alleging that a child is delinquent for committing an act that would be a felony if committed by an adult, the juvenile court may transfer the child to adult court for prosecution if it finds (1) that the child was at least 14 years old at the time of the charged act; (2) that there is probable cause to believe that the child committed the charged act; and (3) that the child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. R.C. 2152.12(B)(1) through (3). This is known as a discretionary transfer.

{¶ 20} Before making a discretionary-transfer decision, the juvenile court must "order an investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child by a public or private agency or a person qualified to make the examination." R.C. 2152.12(C). The juvenile court must also hold a hearing. R.C. 2152.12(B); Juv.R. 30(C). In addition, the court must consider the statutory factors under R.C. 2152.12(D), which weigh in favor of transferring the case, and the statutory

8

factors under R.C. 2152.12(E), which weigh against transferring the case. R.C. 2151.12(B)(3).

{¶ 21} The factors under R.C. 2152.12(D), which weigh in favor of a transfer, are:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

9

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

{¶ 22} The statutory factors under R.C. 2152.12(E), which weigh against a transfer, are:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

{¶ 23} In weighing these factors, the juvenile court may also consider "any other relevant factors" in favor of, or against, a transfer to adult court. R.C. 2152.12(D) and (E). "Because the statutory scheme does not dictate how much weight should be given to any specific factor, the ultimate decision rests in the discretion of the juvenile court." *State v.*

*Bryant*, 2024-Ohio-1192, ¶ 16 (2d Dist.), citing *State v. Gregory*, 2020-Ohio-5207, ¶ 32 (2d Dist.), and *State v. Cuffie*, 2020-Ohio-4844, ¶ 10 (2d Dist.).

{¶ 24} "[A]n amenability hearing is a broad assessment of individual circumstances and is inherently individualized and fact-based." *State v. Ferguson*, 2017-Ohio-7930, ¶ 44 (2d Dist.). A "juvenile court's decision to exercise discretion to transfer a juvenile to adult court [after an amenability hearing] must be supported by a preponderance of the evidence." *State v. Nicholas*, 2022-Ohio-4276, paragraph two of the syllabus. "[A] preponderance of evidence means the greater weight of evidence." *Travelers' Ins. Co. of Hartford, Conn. v. Gath*, 118 Ohio St. 257, 261 (1928). "'The greater weight may be infinitesimal, and it is only necessary that it be sufficient to destroy the equilibrium.'" *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987), quoting *Gath* at 261.

**IV. Discussion**

{¶ 25} We review a juvenile court's decision regarding the amenability of a juvenile to rehabilitation in the juvenile system under an abuse of discretion standard of review. *State v. Peaks*, 2025-Ohio-2707, ¶ 37, citing *State v. Howard*, 2018-Ohio-1863, ¶ 14 (2d Dist.), citing *In re M.P.*, 2010-Ohio-599, ¶ 14, and *State v. Watson*, 47 Ohio St.3d 93, 95 (1989). This standard is not whether the appellate court would reach the same result on the evidence which was before the juvenile court. *State v. Hopfer*, 112 Ohio App.3d 521, 535 (2d Dist. 1996). Instead, "[a]n abuse of discretion is 'an attitude that is unreasonable, arbitrary or unconscionable.'" *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). An abuse of discretion can also be found when the record does not support the court's determination on the amenability issue by a preponderance of the evidence. *State v. Nicholas*, 2022-Ohio-4276, ¶ 56.

11

**{¶ 26}** Roberts argues that the juvenile court abused its discretion in multiple ways in applying the factors of R.C. 2152.12. First, he claims that the court failed to consider that he was under the negative influences of other people during the October 2024 shooting and that he was emotionally and psychologically immature for the transfer, which are both factors that weigh in favor of keeping Roberts in the juvenile system, as stated by R.C. 2152.12(E)(3) and (6). However, the juvenile court's written decision demonstrates that it considered both factors. Relative to R.C. 2152.12(E)(3), the court found that Roberts "was a principal actor along with three other individuals." Division (E)(3) of the statute allows a juvenile court to make either one of two findings by stating that the court must consider whether "[t]he child was not the principal actor in the act charged, *or*, at the time of the act charged, the child was under the negative influence or coercion of another person." (Emphasis added.). "The legislature's use of the word 'or,' a disjunctive term, signifies the presence of alternatives." *In re Estate of Centorbi*, 2011-Ohio-2267, ¶ 18. Since the juvenile court determined one factor out of the choice of two, there was no error in failing to pick the second option and consider whether Roberts was under the negative influence or coercion of other people.

**{¶ 27}** Roberts also argues that the juvenile court failed to consider his emotional and psychological immaturity for the transfer pursuant to R.C. 2152.12(E)(6), but the court's decision demonstrates that it did. The court found that "Dr. Hrinko opined that the youth is immature for his age and would likely be susceptible to manipulation within the adult system." The court determined that as contemplated in R.C. 2152.12(E)(6), Roberts' immaturity weighed in favor of Roberts remaining in the juvenile system. The court further indicated in its conclusions that it "weighed the immaturity of the youth." While this factor also appears in the list of factors to consider in favor of a transfer, the court specifically

indicated that it did not consider R.C. 2152.12(D)(8) for purposes of the factors in favor of transfer.

{¶ 28} Similarly, Roberts' third argument is that the juvenile court failed to consider that the adult system would increase the likelihood of recidivism and have a negative impact on him in the future. Again, the court's decision demonstrates otherwise. The court stated that "Dr. Hrinko indicated it was his belief that placement in the adult system would only 'crystalize' the youth's criminal behavior" and that Roberts would "likely be susceptible to manipulation within the adult system."

{¶ 29} Finally, Roberts contends that the court disregarded the recommendations and opinions of both Dr. Hrinko and the GAL. Both opined that Roberts was amenable to the juvenile system and could be treated with a sentence at the Department of Youth Services, which, in turn, would adequately protect the public. While we agree that a juvenile court may not disregard or refuse to consider the evidence before it, *State v. Ellis*, 2022-Ohio-147 (2d Dist.), that is not what occurred in Roberts' case. Instead, the juvenile court considered Dr. Hrinko's opinion and the GAL's recommendation that Roberts remain in the juvenile system. The court explicitly stated in its decision that "[t]he GAL recommended the youth remain in the juvenile justice system" and "Dr. Hrinko opined there was sufficient time available in the juvenile justice system to rehabilitate the youth with a reasonable degree of certainty of public safety should the youth be held in a secure facility." However, the juvenile court disagreed with the recommendations and stated as much in its decision by explaining that it was "not convinced that there is sufficient time to rehabilitate the youth with the current resources available in the juvenile justice system, including a commitment to the Ohio Department of Youth Services, without compromising a degree of public safety."

13

**{¶ 30}** In *Ellis*, we expressly stated that a juvenile court has discretion to disagree with an expert's opinion regarding amenability. *Id*. at ¶ 23; *See also In re J.S*., 2023-Ohio-2675 (1st Dist.) (juvenile court disagreed with the ultimate opinion of the expert who opined that the youth was not amenable to the juvenile system). Juvenile courts may reach contrary conclusions of an expert's opinion when there are reasons in the record that support the court's determination, even if uncontradicted. *State v. Walker*, 2017-Ohio-9255, ¶ 14 (1st Dist.), citing *State v. Brown*, 5 Ohio St.3d 133, 135 (1983), and *State v. White* 2008-Ohio-1623, ¶ 71.

**{¶ 31}** Additionally, there is nothing in R.C. 2152.12(C) or Juv.R. 30(C) that require an evaluator appointed for the purposes of completing a mental evaluation on a juvenile to provide an expert opinion on the ultimate issue of amenability. *See* R.C. 2152.12(C); Juv.R. 30(C); *State v. Phillips*, 2010-Ohio-2711 (12th Dist.). That is for the juvenile court to determine after weighing all required statutory factors. Moreover, we have previously said that "a trial court is not bound to follow a guardian ad litem's recommendation." *Bomberger-Cronin v. Cronin*, 2014-Ohio-2302, ¶ 27 (2d Dist.); *See also Owais v. Costandindis*, 2014-Ohio-4103, ¶ 35 (2d Dist.) (As the fact finder, the trial court may determine the weight to be given to the guardian ad litem's recommendation). Because the law does not require that a juvenile court follow the recommendation of a GAL, or the ultimate opinion of an expert witness who concludes that the juvenile is amenable to the juvenile justice system, we are not convinced by Roberts' argument that the juvenile court erred in this regard.

**{¶ 32}** In our review of the record, the juvenile court carefully considered the factors that weighed in favor of transfer against the factors that weighed in favor of Roberts remaining in the juvenile justice system. There is ample evidence supporting the juvenile court's determinations that Roberts was not amenable and that there was insufficient time

for his rehabilitation in the juvenile system. The victim was shot eight to ten times and suffered serious physical harm as a result. Although Roberts may or may not have fired a shot at the victim on that night, Roberts accompanied the male and female involved in the shooting and had a firearm as well. Before the shooting took place, Roberts was leaning up against the car that all three individuals had used to drive to the apartments, and he held a firearm while he watched his male and female companions interact with the victim prior to his male companion firing the first shot. Immediately after the shooting, Roberts left the area with his companions in the same car, threw the firearm in the river, and went to an apartment with his companions, where they all held conversation and washed their hands with floor cleaner used for mopping. These facts support the juvenile court's findings under R.C. 2152.12(D)(1) and (5), which are that Roberts caused physical harm to the victim and had a firearm at the time of the offense.

{¶ 33} The juvenile court also had sufficient evidence supporting its findings under R.C. 2152.12(D)(6) and (7). At the time of the offense, Roberts was under community control sanctions and on intensive probation supervision. During his 17 months under supervision, Roberts was largely noncompliant and had violated probation once for possessing at least five firearms. In addition, due to his noncompliance under supervision, in our view, it was reasonable for the juvenile court to conclude that Roberts' lack of compliance indicated that he would not be rehabilitated in the juvenile system. This is especially true because the juvenile court could make efforts to rehabilitate Roberts for only up to five years, given his age of 16 years old at the time of the amenability hearing.

{¶ 34} On balance, the juvenile court weighed two factors it deemed relevant and applicable to Roberts in favor of keeping him in the juvenile system under R.C. 2152.12(E)(6) and (8). However, in the court's balancing of all factors, it ultimately determined that the

15

factors that weighed in favor of the transfer to the adult court for prosecution outweighed the factors in favor of maintaining him in the juvenile justice system. We may not reweigh these factors or substitute our judgment for that of the juvenile court. Instead, in applying the standard of review here, we conclude that because the juvenile court's determination of Roberts non-amenability to the juvenile system is supported by the record by a preponderance of the evidence, the juvenile court did not abuse its discretion when it relinquished jurisdiction and transferred him for prosecution as an adult. Roberts' assignment of error is overruled.

### V. Waiver of Right to Appeal Amenability Determination

{¶ 35} The State alternatively argues that by entering his guilty plea, Roberts waived the ability to contest the amenability decision on appeal. In response, Roberts argues that his guilty plea did not waive his challenge of the juvenile court's amenability determination.

{¶ 36} We have historically considered challenges to the non-amenability of a youth where a juvenile court relinquishes jurisdiction. *See State v. Peaks*, 2025-Ohio-2707 (2d Dist.); *State v. Hoskins*, 2018-Ohio-4529 (2d Dist.); *State v. Wilson*, 2017-Ohio-7223 (2d Dist.); *State v. Morrow*, 2000 WL 192365 (2d Dist. Feb. 18, 2000); *State v. Sledge*, 1991 WL 60634 (2d Dist. April 11, 1991). Though our precedents indicate that we have considered the issue of amenability despite a guilty plea, we note that the Fourth and Seventh Districts have held that a juvenile's guilty plea after transfer to the general division of a common pleas court waives the juvenile's ability to contest the juvenile court's determinations regarding amenability. *See State v. Moore*, 2022-Ohio-460 (4th Dist.); *State v. Zarlengo*, 2021-Ohio-4631 (7th Dist.). In contrast, the Sixth and Eighth Districts have held that a guilty plea in the general division of a common pleas does not waive a juvenile's challenge to a juvenile court's amenability determinations on appeal. *See State v. Coleman*, 2025-Ohio-773

16

(6th Dist.); *State v. D.T.*, 2024-Ohio-4482 (8th Dist.). The issue is currently pending before the Ohio Supreme Court. *State v. D.T.*, 2024-Ohio-4482 (8th Dist.), *appeal accepted*, 2025-Ohio-231.

**{¶ 37}** Given our affirmance of the juvenile court's judgment in this case, we need not determine whether Roberts waived the right to challenge the amenability determination by entering a guilty plea.

**VI. Conclusion**

**{¶ 38}** Having overruled Roberts' assignment of error, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

LEWIS, P.J., and TUCKER, J., concur.

17